YPSILANTI TOWNSHIP v GENERAL MOTORS CORPORATION

Docket No. 161245. Submitted June 2, 1993, at Lansing. Decided
    August 3, 1993, at 9:00 A.M. Leave to appeal denied, 443 Mich
    —.

    The Charter Township of Ypsilanti brought an action in the
Washtenaw Circuit Court against General Motors Corporation,
seeking to enjoin the defendant from transferring production of
vehicles from its Willow Run plant to any other facility. The
County of Washtenaw and the State of Michigan were made
plaintiffs. Following a lengthy trial, the court, Donald E. Shel-
ton, J., enjoined the defendant from transferring production,
holding that the defendant had promised to continue produc-
tion and maintain continuous employment at the Willow Run
plant in exchange for twelve-year, fifty percent tax abatements
granted with respect to two separate capital improvements
made at the plant and that the promise resulted in an enforce-
able contract on the basis of promissory estoppel. The defen-
dant appealed.

    The Court of Appeals held:

    Promissory estoppel requires an actual, clear, and definite
promise that the promisor reasonably should expect to induce
action or forbearance by the promisee or a third party. The
statement made on behalf of the defendant relative to contin-
ued production and employment was nothing more than a
repeating of the statutory prerequisites for the granting of an
abatement stated using the hyperbole and puffery that might
be expected of one seeking an abatement and clearly was not
intended to create an independent contractual duty. Further, it
is clear from the record that the township at the time of
granting the abatements did not expect that the granting of the
abatements contractually would insure that no transfers of
production or reductions in employment would take place.

    The trial court clearly erred in determining that there was
an enforceable promise that there would be no future changes
in production or employment levels and that there was reliance

REFERENCES

Am Jur 2d, Contracts § 120; Estoppel and Waiver § 48.
Comment Note.—Promissory estoppel. 48 ALR2d 1069.

by the township on such a promise. Accordingly, the court erred in granting the requested injunctive relief.

Reversed.

1. CONTRACTS — PROMISSORY ESTOPPEL — REASONABLE RELIANCE.

Promissory estoppel requires an actual, clear, and definite promise that the promisor reasonably should expect to induce action or forbearance by the promisee or a third party; reliance by the promisee or a third party is reasonable only if it is induced by an actual promise.

2. CONTRACTS — PROMISSORY ESTOPPEL — TAXATION — TAX ABATEMENTS — PUFFERY.

Hyperbole and puffery by an employer relative to job and work retention and expectations made in conjunction with an application for a tax abatement does not necessarily constitute a promise of future employment levels that may be enforced as a matter of contract by the taxing authority under the doctrine of promissory estoppel.

*McLain & Winters* (by *Wm. Douglas Winters*), for the Charter Township of Ypsilanti.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Russell E. Prins* and *Ross H. Bishop,* Assistant Attorneys General, for the State of Michigan.

*Harris, Guenzel, Meier & Nichols, P.C.* (by *Robert E. Guenzel*), for the County of Washtenaw.

*Mayer, Brown & Platt* (by *Stephen M. Shapiro, Kenneth S. Geller, James D. Holzhauer, Charles Rothfeld,* and *Michael A. Vatis*), *Dykema Gossett* (by *Donald S. Young*), and *Lee A. Schutzman,* for General Motors Corporation.

Amici Curiae:

*Bauckham, Sparks, Rolfe & Thomsen, P.C.* (by *John H. Bauckham* and *Lynda E. Thomsen*), for the Michigan Townships Association.

*Clark, Klein & Beaumont* (by *Dwight H. Vincent, J. Walker Henry, Nancy J. Gordon,* and *Robert J. McClory*), for the Michigan Manufacturers Association.

*Larry P. Weinberg* and *Robert D. Lenhard,* for the American Federation of State, County, and Municipal Employees, AFL-CIO.

*Hoekenga and Farrell, P.C.* (by *Daniel J. Hoekenga*), for the Michigan Education Association.

*V. Mark Slywynsky,* for the American Automobile Manufacturers Association and the Michigan Chamber of Commerce.

*Barbara Harvey, Fran Ansley,* and *Healy, Davidson & Hornack* (by *Joseph S. Hornack*), for the Federation for Industrial Retention & Renewal.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Barbara J. Brown,* Assistant Attorney General, for the Attorney General.

*Jordan Rossen, Betsey A. Engel, Julie H. Hurwitz,* and *Mark Granzotto,* for the International Union, UAW; Local 1776, UAW; Phillip J. Donato; Charles D. Evans; and Flora Gibson.

Before: REILLY, P.J., and SAWYER and P. J. CLULO,* JJ.

PER CURIAM. Defendant appeals from a February 9, 1993, order of the Washtenaw Circuit Court that enjoins defendant "from transferring the production of its Caprice sedan, and Buick and Cadil-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

lac [sic, Chevrolet] station wagons, from the Willow Run plant to any other facility." We reverse.

Defendant has operated two plants in Ypsilanti for a number of years. The Hydra-Matic plant employs approximately 9,000 workers and the Willow Run plant employs more than 4,000. In 1975, the township created an industrial development district for the Hydra-Matic plant. It did the same for Willow Run in 1977. Over the years the township granted defendant eleven tax abatements under MCL 207.551 *et seq.*; MSA 7.800(1) *et seq.*, eight at Hydra-Matic and three at Willow Run. That statute authorizes municipalities to establish plant rehabilitation and industrial development districts to encourage the creation and maintenance of jobs in the state. The act provides for tax exemptions for businesses that meet the requirements of the act. *Creative Industries Group, Inc v Dep't of Treasury,* 187 Mich App 270, 272; 466 NW2d 311 (1991). Two of the Willow Run abatements, for 1984 and 1988, are at issue in this case. On July 17, 1984, the township approved defendant's application for a twelve-year fifty percent abatement of personal property taxes on the corporation's $175 million investment for the introduction of a new car. The State Tax Commission later granted the exemption certificate. In April 1988, defendant announced that it would produce a new rear-wheel-drive vehicle, the Chevrolet Caprice, at Willow Run. Six months later, on October 7, 1988, defendant applied for a tax abatement for that project. The application was also for a twelve-year fifty percent abatement of personal property taxes on defendant's planned $75 million project. Following public hearings, the township approved that application, and the State Tax Commission issued an exemption certificate.

On December 18, 1991, defendant announced

that it had decided to consolidate the work being done at Willow Run and Arlington, Texas, at Arlington. Defendant claims that the consolidation was necessary because of the company's record losses and because its Caprice sales, projected at 330,000 a year, had been running at about 275,000 a year and had slipped below 100,000 by late 1991.

The township commenced this action on April 29, 1992. The county joined voluntarily, while the state joined as an amicus curiae, but the trial court added the state as a party-plaintiff. The complaint alleged counts of breach of a contract created by the tax abatement statute, breach of a contract created by conduct, promissory estoppel, unjust enrichment, and misrepresentation.[1] Following a lengthy trial, the trial court found that the abatement statute and application did not create a contract between the township and the corporation. However, it did find that defendant was bound by promissory estoppel to retain production of the Caprice line in Willow Run, as long as the company produces that model. It concluded:

> There would be a gross inequity and patent unfairness if General Motors, having lulled the people of the Ypsilanti area into giving up millions of tax dollars which they so desperately need to educate their children and provide basic governmental services, is allowed to simply decide it will desert 4500 workers and their families because it thinks it can make these same cars cheaper somewhere else.

The trial court, relying on the background of

---

[1] The circuit court did not separately discuss the misrepresentation claim but incorporated it into its holding regarding promissory estoppel. A count for environmental nuisance was voluntarily dismissed without prejudice before trial. The unjust enrichment count was not discussed or decided by the trial court. The township considers that claim to be viable and preserved. We express no opinion concerning the claim or its viability, because neither point was decided below.

defendant's negotiations for abatements and principally on a statement by Willow Run plant manager Harvey Williams at a public hearing, found that a promise had been made. Williams stated that "[u]pon completion of this project and favorable market demand, it will allow Willow Run to continue production and maintain continuous employment for our employees." The trial court ruled:

> In the context of this background, when the plant manager, in the prepared statement on behalf of General Motors stated that, subject to "favorable market demand," General Motors would "continue production and maintain continuous employment" at the Willow Run plant, *it was a promise.* The promise was clearly that if the Township granted the abatement, General Motors would make the Caprice at Willow Run and not just transfer that work somewhere else. [Emphasis added.]

A trial court's findings of fact in an equity action are reviewable under the clearly erroneous standard. A finding is clearly erroneous if the appellate court is left with a definite and firm conviction that a mistake has been made. *Beason v Beason,* 435 Mich 791, 802-804; 460 NW2d 207 (1990); *Attorney General v Lake State Wood Preserving, Inc,* 199 Mich App 149; 501 NW2d 213 (1993); *Badon v General Motors Corp,* 188 Mich App 430; 470 NW2d 436 (1992); MCR 2.613(C).

The elements of promissory estoppel are:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may

be limited as justice requires. [1 Restatement Contracts, 2d, § 90, p 242.]

Promissory estoppel requires an actual, clear, and definite promise. *State Bank of Standish v Curry,* 442 Mich 76, 84-85; 500 NW2d 104 (1993). Further, "reliance is reasonable only if it is induced by an actual promise." *Id.* at 84. A determination that there was a promise will be overturned if it is clearly erroneous. *Id.*[2]

The trial court's finding that defendant promised to keep Caprice and station wagon production at Willow Run is clearly erroneous. First, the mere fact that a corporation solicits a tax abatement and persuades a municipality with assurances of jobs cannot be evidence of a promise. The very purpose of tax abatement legislation is to induce companies to locate and to continue business enterprises in the municipality. Even the trial court recognized this when it stated, "Every time, the inducement to the township was the same—jobs will be created or preserved at that plant, and it should have been, for that was the ostensible purpose of the abatement."

Second, representations of job creation and retention are a statutory prerequisite. An applicant for an industrial facilities exemption certificate must, among other things, certify that "[c]ompletion of the facility is calculated to, and will *at the time of issuance of the certificate* have the reasonable likelihood to create employment, retain employment, prevent a loss of employment, or produce energy in the community in which the facil-

---

[2] Plaintiffs' reliance on *Curry* is misplaced. It merely dealt with a situation in which there was a clear promise upon which the plaintiff detrimentally relied. *Curry,* rather than compelling a conclusion in plaintiffs' favor, points to why the doctrine does not apply to this case: the promise necessary to invoke the doctrine is distinguished from a statement of opinion or mere prediction of future events. *Id.* at 86.

ity is situated." MCL 207.559(2)(e); MSA 7.800(9)(2)
(e); emphasis added.

Third, the fact that a manufacturer uses hyperbole and puffery in seeking an advantage or concession does not necessarily create a promise. For example, statements such as "We're partners" and "We look forward to growing together" were found not to constitute a promise to keep a collective bargaining agreement in force for the foreseeable future so as to create by promissory estoppel a continuing duty of the employer to honor an expired agreement. *Marine Transport Lines, Inc v Int'l Organization of Masters, Mates, & Pilots,* 636 F Supp 384 (SD NY, 1986). Nor did exhortations for union concessions in order to keep a foundry open constitute promises under promissory estoppel to prevent a foundry from closing. *Abbington v Dayton Malleable, Inc,* 561 F Supp 1290 (SD Ohio, 1983), aff'd 738 F2d 438 (CA 6, 1984). Similarly, exhortations to its employees to increase productivity and assurances that a plant would not be closed, as long as it was profitable, did not establish by promissory estoppel an obligation on a steel company to keep open a plant. *Local 1330, United Steel Workers v United States Steel Corp,* 631 F2d 1264 (CA 6, 1980).

Turning to the case at bar, almost all the statements the trial court cited as foundations for a promise were, instead, expressions of defendant's hopes or expectations of continued employment at Willow Run. The court summarized the corporation's concerted efforts to obtain abatements for Hydra-Matic between 1974 and 1981 as follows:

> Over the years, General Motors followed the example set in its first application and a course of conduct developed between General Motors and the township for the granting of tax abatements.

Each time General Motors wanted an abatement to make a physical change in the plants, it would invite township officials to the plant for a briefing, a tour of the plant, and lunch. Then the formal application would be submitted and General Motors officials would appear at a public hearing before the entire Board, which would then approve the application. Each time, the Board was advised, in some specifics, of the impact of the improvements, and presumably the abatement, on production and employment levels in the plant.

The acts cited by the trial court were acts one would naturally expect a company to do in order to introduce and promote an abatement proposal to a municipality. The acts did not amount to a promise and, as course-of-conduct evidence, showed only efforts to take advantage of a statutory opportunity. They did not constitute assurances of continued employment. In any event, we note that the activity referred to by the trial court related to Hydra-Matic, not Willow Run.

The court cited the State Tax Commission's resolution regarding the 1984 Willow Run abatement in which the commission's approval "was based on its concern for economic development in Washtenaw County which results in increased job opportunities for unemployed and underemployed residents of our county." However, that was the commission's expectation, not defendant's promise.

In defendant's 1988 presentation, Russell Hughes, the Willow Run comptroller, recited background, including: "Since the '81, '82 time-frame you can see that we've been basically maintaining about five thousand employees each year in a very consistent pattern." However, Hughes made the statement by way of history, and not as an assurance of future employment.

The circuit court also cited plant manager Harvey Williams' prepared statement:

> General Motors selected Willow Run to build these new vehicles because of our reputation for high quality, our continued harmonious relationship and our spirit of all employees working together.
>
> . . . We are asking the Board to accept our application and pass on it favorably. To join the corporation in the kind of relationship we have in the Township in assuring future investments in our plant.

However, that language is nearly identical to the puffery the federal court found not to constitute a promise in *Marine Transport Lines, Inc, supra.*

The trial court referred to the township assessor's remarks:

> Needless to say I recommend approval of the petition. Based on the past history in dealing with the people at General Motors, they've always done what they said they would do and they've kept the jobs there and they kept the plant operating as an operational facility.

Again, however, that was the assessor's evaluation, not defendant's promise.

The court quoted the State Tax Commission's resolution, which stated in part, "Where the facts indicate that positive results in gains in employment and taxes appear justified . . . we will support all the local unit decisions." Once again, that was the commission's assessment, not defendant's promise of continuing employment.

Defendant's statement that the lower court principally relied on to find a promise was not sufficient to constitute a promise. Plant manager Williams stated:

> Good evening, my name is Harvey Williams and I am the plant manager of the Buick Oldsmobile Cadillac groups [sic] Willow Run plant.

We are pleased to have this opportunity to appear before the Ypsilanti Township Board of Trustees. This application for an industrial facilities exemption certificate is for an investment totalling $75,000,000.00 for machinery and equipment. This will enable our plant to assemble a new full size car in the 1991 model year.

This new rear wheel drive car is substantially larger then [sic] our current model. And specifically it will generate major booth, oven and conveyor changes in the paint shop and assembly line process, changes in the body, trim and chassis department. This change will also provide additional flexibility at our assembly plant. Essentially we would now have the capability to produce either front or rear wheel drive cars with minimum modifications to our facility. *Upon completion of this project and favorable market demand, it will allow Willow Run to continue production and maintain continuous employment for our employees.*

I would like to introduce Russell Hughes, our controller, who will review pertinent charts pertaining to our request. [Emphasis added.]

Although the parties greatly dispute what the speaker meant by "favorable market demand" and even whether defendant should have been allowed to narrow it to Willow Run production, the fact is that the statement qualified defendant's expectation that the new abatement would allow it to continue production at the plant and maintain continuous employment for the employees. Again, even that statement was nothing more than the kind of hyperbole a corporation would use to obtain the tax abatement benefits afforded by the statute and willingly offered by the township. The trial court clearly erred in concluding that Williams' statement, and particularly the portion emphasized in the foregoing quotation, constituted a promise of continued Caprice and station wagon

production at Willow Run as long as the company produces those vehicles.

Even if the finding of a promise could be sustained, reliance on the promise would not have been reasonable. "[T]he reliance interest protected by [Restatement] § 90 is reasonable reliance." *Curry, supra* at 84.

It has never been held that an abatement carries a promise of continued employment. Indeed, the history of this case shows that persons involved in the 1988 Willow Run abatement understood that defendant was not promising continued employment.

At a township board meeting in November 1988, Dillard Craiger, chairman of the Washtenaw County Board of Commissioners, opposed a tax break for Willow Run "unless a commitment was made by General Motors to remain operating at the present facility in Ypsilanti Township for that period of time thereby securing employment for the community." Craiger also complained that defendant had not given any commitments whatsoever. Outgoing Township Supervisor Ron Allen nevertheless endorsed defendant's request for tax relief, noting that "General Motors has never been overbearing or threatening" and cautioning "the Board not to take any action that would unravel the success that the Township has had [in dealing with General Motors] over the last several years." At a subsequent work session held on December 5, 1988, at least five of the seven board members— including new Township Supervisor Wesley Prater and Township Treasurer Ruth Ann Jamnick—decided to support the application.

At the public hearing at which plant manager Harvey Williams supposedly promised "continuous employment for our employees," plant comptroller Russell Hughes almost immediately warned that

"[o]ne percent [market share] penetration that we lose at General Motors means ten thousand jobs for this corporation of our employees. In the assembly plant operation one percent means about twenty five hundred jobs throughout the US and all assembly plants."

Other speakers then took the floor, several of whom specifically pointed out that defendant had not committed itself to continue operating the Willow Run plant for any particular period of time. Washtenaw County Commission Chairman Craiger, after listening to plant manager Williams' presentation, restated in detail his admonition from the previous month:

> The plant has not given us any commitments in any way that they will not "outsource" production, they will not tell you how long they are going to stay, they will not tell you that we only want it as long as we stay. Who knows, they might move tomorrow or two years from now and they will have been given three tax breaks with a hidden plan.
>
> *   *   *
>
> If Georgia or Alabama gives them a hundred percent [tax abatement], don't we have a right to bid on it? Don't we have that right, or should they just say, we're closing the plant because we got a better deal. . . . I would like to be able for them to tell us how long are they going to stay.

Others echoed this concern. A Mr. Smith referred to increases in his own property taxes and added: "I have eighteen years in and I'd like to see them stay here twelve years so I can retire, but they are not promising anything." Township Supervisor Prater, who chaired the meeting, then interjected a "point of clarification," explaining to Smith that "the abatement they are asking for is

not on real estate tax, it's personal property tax."
But Prater did not take issue with Smith's state-
ment that no "promise" had been made, and
Smith replied that "there should be some kind of
proof by them that they are not going to . . . move
out." Prater made no response. Other witnesses
agreed with Smith that defendant had made no
commitment to continue operations at Willow
Run. Mr. Debs, president of the local union at the
Willow Run plant, pointed out that "nobody can
tell us what the sales are going to be" and that
"no plant can stay open" if sales drop. A Mr.
Alford remarked that "there were some legal is-
sues there that cannot bind [Willow Run] or Hy-
dra-Matic to giving jobs to Ypsilanti Township."

Defendant's representatives were not asked to
respond to these comments, and no member of the
township board took issue with them. Instead,
Supervisor Prater urged the board to approve
defendant's application. The township board then
voted unanimously to approve a twelve-year abate-
ment at Willow Run; the resolution contained no
suggestion that approval was conditioned on a
commitment to operate the plant for any particu-
lar period.

In short, defendant made no promises.

Reversed. Defendant may tax costs.