*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

COURTNEY E. MORGAN,

        Plaintiff/Counterdefendant-Appellant,

v

JEFFREY T. MEYERS,

        Defendant/Counterplaintiff-Appellee.

UNPUBLISHED
January 21, 2026
9:59 AM

No. 370503
Wayne Circuit Court
LC No. 17-001985-CB

Before: RIORDAN, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Plaintiff appeals a series of trial court orders granting summary disposition in favor of defendant on claims for breach of contract, breach of fiduciary duty, promissory estoppel, and tortious interference with economic advantage—all of which stem from defendant allegedly usurping business opportunities from plaintiff at the parties' law firm, Morgan & Meyers PLC. Plaintiff essentially argues that the summary disposition orders should be reversed, and the case should proceed with further discovery. We disagree and affirm.

## I. BACKGROUND

The parties are trial lawyers specializing in personal injury law. They practiced together at various law firms before starting their own firm in 2003, which they organized as a professional limited liability company pursuant to the Michigan Limited Liability Company Act (LLCA) MCL 450.4901, *et seq.* The parties are the sole members. At the time of the firm's formation, the parties did not enter into a written operating agreement. However, over the course of the next decade, the parties did eventually enter into five written agreements. The first agreement was signed in October 2007, in which the parties agreed that each member was "personally responsible for all expenses directly attributable to that member," and that each member was "also personally responsible for 50% of all other firm expenses." The agreement also provided that in determining annual compensation, each member would retain 60% of his net fee production and share 40% of his net fee production on a 50/50 basis with the other member. Finally, the agreement provided that if a member's fee production was less than the expenses for which he was responsible, that shortfall could be funded by a firm loan to that member.

The second written agreement was executed in December 2008, and it addressed the distribution of revenue and expenses. In December 2009, the parties' third written agreement memorialized their practice of treating all costs advanced on a file as a loan from the member to the firm. The agreement explained how loans were to be reconciled and repaid and addressed shortfalls in case costs advanced by a member. The agreement also established that the parties each had significant outstanding loans to the firm. In December 2013, the parties signed yet another agreement regarding case costs. Pursuant to this agreement, case costs attributable to the parties' respective "dockets" were owned by them individually. The parties' final written agreement regarding operation of the PLC was signed in December 2014 and provided for the treatment of plaintiff's operational shortfall of $474,239.54 for the 2014 calendar year.

The parties' professional relationship became strained when plaintiff concluded that defendant had poached two clients from plaintiff's own referral sources. According to plaintiff, the parties orally agreed "not [to] step on each other's toes or attempt to take away anyone's referral sources." Notwithstanding this agreement, plaintiff contends that defendant usurped the representation of the family of Jeffery Williams, the victim of a fatal trucking accident. Plaintiff testified that an attorney friend of the Williams family, Susan Vincent, contacted plaintiff's colleague, Fritz Damm, seeking recommendations for a lawyer for the Williamses. Damm gave Vincent plaintiff's name, as well as the name of another attorney. But Vincent never contacted plaintiff. In fact, plaintiff later learned that Vincent had recommended *defendant* to the Williams family, instead of recommending plaintiff. Plaintiff also learned that Vincent had attended law school with defendant, and the two were moot court partners. Ultimately, the Williams family selected defendant to represent them.

The second allegedly stolen case involved a lawyer named Jennifer Engelhardt, who had never referred a case to plaintiff before. However, Engelhardt had previously litigated a case against plaintiff's associate, Ron Bowling, before he was hired at the PLC. Engelhardt also knew defendant and had referred several cases to him over the years. Engelhardt's firm had also had a referral relationship with defendant before she joined the firm. Relevant to this appeal, Engelhardt referred a medical malpractice case to the PLC involving the death of Khaled Aljabli. She averred that when she made the referral, she assumed that Bowling and defendant would work together, with defendant serving as lead counsel. Had she known that Bowling and defendant did not collaborate on cases, she would have made it clear that she intended to refer the case only to defendant.

Plaintiff also discovered in 2016 that defendant had created his own website that independently advertised defendant's legal services and may have had a separate phone line. Plaintiff contended that this website was "in direct competition" with the PLC's website. However, defendant testified that he created his website "a couple of years" before the PLC created one.

In response to defendant's alleged competition with the PLC, plaintiff filed a complaint against defendant in 2017, asserting breach of contract, breach of fiduciary duty, tortious interference with economic advantage, and member oppression under MCL 450.4515. Plaintiff later amended his complaint to add a count of promissory estoppel. He requested damages and the dissolution of the PLC.

Defendant counterclaimed, denying liability and seeking dissolution of the PLC. Simultaneously, defendant moved for summary disposition under MCR 2.116(C)(8) and MCR 2.116(C)(10). The trial court determined that there was no evidence that the parties had an agreement not to interfere with each other's referral sources, and—even if such an agreement existed—that there was no evidence of defendant breaching the agreement. Consequently, the trial court dismissed plaintiff's claims for breach of contract, promissory estoppel, and tortious interference. The trial court also dismissed plaintiff's claim of member oppression because defendant did not "control" the PLC. Rather, the parties were equal members. The trial court did, however, find a triable issue of fact regarding whether defendant had breached his fiduciary duty to plaintiff by creating a competing website.

Defendant moved for reconsideration of the trial court's order on the basis that defendant's fiduciary duties ran to the PLC, not to plaintiff personally, and plaintiff could not assert a derivative breach of fiduciary duty claim on behalf of the PLC. The trial court reversed its prior ruling and dismissed plaintiff's claim for breach of fiduciary duty on the basis that plaintiff failed to follow the LLCA's prerequisites to filing his lawsuit. Plaintiff then sought reconsideration, which the trial court denied. Thereafter, all of plaintiff's claims were dismissed, leaving only defendant's counterclaim for dissolution.

The trial court entered a stipulated order of dissolution, and the parties ceased operating as Morgan & Meyers PLC in February 2019. Plaintiff moved out of the PLC's leased premises in May 2019. The only remaining issue was the allocation of the firm's final expenses. In October 2019, defendant moved for summary disposition on this issue, asserting that the parties should equally divide the costs—which included a "tail" insurance policy for professional activities undertaken by either of them while practicing as Morgan & Meyers PLC.

The trial court determined that there was no genuine issue as to any material fact that the parties' course of conduct established that costs not attributable to a particular file were traditionally split evenly between the parties. Accordingly, the trial court granted summary disposition in favor of defendant, ordering that the cost of the malpractice "tail" policy, rent, and shared employees' salaries should be split equally. However, the trial court held that plaintiff might be entitled to a credit for his contribution to the PLC's purchase of computers and phone system, his moving expenses, and the cost of some of the lobby furniture. The parties agreed to refer these remaining issues to binding arbitration. The arbitrator determined that plaintiff was responsible for his own moving expense, computers, and phone system. Following the arbitrator's award, the trial court entered a final judgment, and this appeal followed.

## II. STANDARDS OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition. *Joseph v Natl Gen Ins Co*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 364798); slip op at 3. A de novo review means that we review the legal issue independently, without deference to the lower court. *Id*. at ___; slip at 3-4.

A motion for summary disposition under MCR 2.116(C)(8) tests a complaint's legal sufficiency. *Jeffrey-Moise v Williamsburg Towne Houses Coop*, Inc, 336 Mich App 616, 623; 971 NW2d 716 (2021). When considering a motion made under this rule, we accept all well-pleaded

factual allegations as true and construe them in the light most favorable to the nonmovant. *Id*. "A motion for summary disposition under MCR 2.116(C)(8) is properly granted when, considering only the pleadings, the alleged claims are clearly unenforceable as a matter of law, and no factual development could justify recovery." *Id*.

A motion under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). When reviewing an order granting summary disposition under this rule, we consider all evidence submitted by the parties in the light most favorable to the nonmoving party. *Id*. If, as in the present case, the nonmoving party would bear the burden of proof at trial, that party must provide documentary evidence showing the existence of a disputable issue to avoid summary disposition. *Novak v Nationwide Mut Ins Co*, 235 Mich App 675, 681; 599 NW2d 546 (1999); see also MCR 2.116(G)(4). "The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition. . . ." *Ass'n of Home Help Care Agencies v Dep't of Health & Human Servs*, 334 Mich App 674, 684 n 4; 965 NW2d 707 (2020) (quotation marks and citation omitted). A motion under MCR 2.116(C)(10) may be granted only when there is no genuine issue of material fact. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *El-Khalil*, 504 Mich at 160 (quotation marks and citations omitted).

In determining whether a sufficient promise has been made, we must objectively examine the words and actions surrounding the relevant transaction in question, as well as the nature of the relationship between the parties and the circumstances surrounding their actions, to determine whether a requisite promise existed. *Novak* 235 Mich App at 687. Additionally, we are mindful that we should "exercise caution in evaluating an estoppel claim and should apply the doctrine only where the facts are unquestionable and the wrong to be prevented undoubted." *Id*.

Finally, to the extent that the resolution of this matter requires statutory interpretation, we review such issues de novo. *People v Buie*, 491 Mich 294, 304; 817 NW2d 33 (2012).

## III. EXISTENCE OF A CONTRACT[1]

Plaintiff argues that he presented a "mountain" of evidence that he and defendant had an enforceable agreement that neither would poach the other's referral sources, such that summary disposition was inappropriate. We disagree.

The first element of a breach-of-contract claim requires the plaintiff to prove that a contract existed. *El-Khalil*, 504 Mich at 164. Along the same lines, promissory estoppel requires "an

---

[1] At the outset, we note that appellant failed to include a statement of the questions presented in his appellate brief. Accordingly, we could treat his issues as waived. See MCR 7.212(C)(5); *People v Fonville*, 291 Mich App 363, 383; 804 NW2d 878 (2011). Nevertheless, we may review issues not properly presented "if a miscarriage of justice will result from a failure to pass on them, or if the question is one of law and all the facts necessary for its resolution have been presented, or where necessary for a proper determination of the case." *People v Smart*, 304 Mich App 244, 252; 850 NW2d 579 (2014). We therefore address each major issue within appellant's brief.

actual, clear, and definite promise." *Ypsilanti Twp v General Motors Corp*, 201 Mich App 128, 134; 506 NW2d 556 (1993). "Before a contract can be completed, there must be an offer and acceptance. Unless an acceptance is unambiguous and in strict conformance with the offer, no contract is formed. Further, a contract requires mutual assent or a meeting of the minds on all the essential terms." *Clark v Al-Amin*, 309 Mich App 387, 394; 872 NW2d 730 (2015) (citations and quotation marks omitted). "[P]arties opposing a motion for summary disposition must present more than conjecture and speculation to meet their burden of providing evidentiary proof establishing a genuine issue of material fact." *Libralter Plastics, Inc v Chubb Group of Ins Cos*, 199 Mich App 482, 486; 502 NW2d 742 (1993). Likewise, "the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings [and present documentary evidence] to set forth specific facts showing that a genuine issue of material fact exists." *Jim's Body Shop Inc v Department of Treasury*, 328 Mich App 187, 206; 937 NW2d 123 (2019), quoting *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996) (alterations in original). Generally, a party's own deposition testimony in support of its claim is insufficient to meet this standard. See *Town v Mich Bell Telephone Co*, 455 Mich 688, 712 n 10; 568 NW2d 64 (1997) (RILEY, J., concurring).

In the trial court and on appeal, plaintiff summarized his evidence of an oral agreement as his own allegations, his own deposition testimony, and his own affidavit. Whether plaintiff's affidavit and deposition testimony were self-serving typically goes to credibility, and the trial court should not make factual findings or weigh credibility when deciding a summary disposition motion. *Ass'n of Home Help Care Agencies*, 334 Mich App at 684 n 4; *Amerisure Ins Co v Plumb*, 282 Mich App 417, 431; 766 NW2d 878 (2009). Rather, issues of witness credibility and what weight to assign a witness's testimony are typically issues for the fact-finder to resolve. See *Barnes v 21st Century Premier Ins Co*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 347120); slip op at 4. A court may only consider substantively admissible evidence actually proffered by the parties when ruling on the motion. *Id*.; slip op at 4-5; see also MCR 2.116(G).

However, this case did not require the trial court to weigh evidence or assess witness credibility. To the contrary, there simply is no substantiating evidence on the record that the parties entered into an oral agreement regarding referral sources. When given the opportunity, plaintiff gave sparse, vague details about the alleged agreement itself. According to plaintiff, the parties orally agreed "not [to] step on each other's toes or attempt to take away anyone's referral sources." However, plaintiff did not identify a specific date when the oral agreement was entered into or took effect, eventually offering only the calendar year 2003. Plaintiff also could not articulate exactly what he understood to constitute a "referral source," describing it generally as "people will call to discuss seeking your services." Nor did plaintiff provide any information about what *defendant* considered to constitute a referral source. Neither plaintiff's deposition testimony nor his affidavit sets forth evidence that show a promise that is "sufficiently definite" to create an oral contract. *Nichols v Seaks*, 296 Mich 154, 159; 295 NW 596 (1941).

Aside from vague allegations unsupported by documentary evidence, plaintiff offers nothing substantive and no documentary evidence to establish that the parties engaged in an oral contract to not interfere with each other's referral sources. Therefore, we conclude that plaintiff failed to demonstrate the existence of a genuine material factual dispute regarding the existence of the alleged oral agreement. For the same reasons, we conclude that the trial court correctly dismissed plaintiff's promissory estoppel claim. Plaintiff simply did not create a genuine dispute

that the parties made each other a "clear and definite promise" regarding interference with referrals. Accordingly, we need not address the parties' dispute regarding whether such an agreement is required to be in writing pursuant to the LLCA.

## IV. BREACH OF AGREEMENT AND TORTIOUS INTERFERENCE

Assuming arguendo that plaintiff presented sufficient evidence of an anti-interference referral agreement, plaintiff contends that he created a genuine issue of material fact that defendant's conduct constitutes a breach of that agreement and interfered with plaintiff's economic advantage. We disagree.

A party asserting a breach of contract must establish by a preponderance of the evidence that (1) a contract existed, (2) the other party breached the contract, and (3) the party claiming breach suffered damages as a result. *El-Khalil*, 504 Mich at 164. The elements of tortious interference with an economic advantage are: (1) the existence of a valid business relationship or expectancy, (2) defendant's knowledge of the relationship or expectancy, (3) defendant's intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the plaintiff. *Dalley v Dykema Gossett*, 287 Mich App 296, 323; 788 NW2d 679 (2010).[2]

We already agreed with the trial court that plaintiff failed to adequately establish a genuine issue of material fact that a contract existed. For the same reasons, plaintiff has failed to establish a legitimate business expectancy regarding the Williams and Aljabli cases. Therefore, plaintiff fails to satisfy the first element of each of the claims of breach of contract and tortious interference. However, even if plaintiff adequately alleged and provided evidence to support the existence of an agreement regarding referral sources, the record does not contain any evidence that defendant breached or interfered with any such agreement or expectation.

As noted, plaintiff failed to meaningfully define "referral source," as it relates to the parties' alleged anti-interference agreement. Plaintiff testified only in a general sense that a referral occurs when "people will call seeking your services" because you have developed a reputation. Regarding the Williams case, assuming that either Damm or Vincent could be considered referral sources for plaintiff, the record does not support that defendant interfered with the referral process. The trial court summarized the relevant facts in the light most favorable to plaintiff, as the nonmoving party:

> Attorney Susan Vincent attested she was highly involved in the Williams family selection of an attorney for this serious auto accident case. Fritz Damm recommended two attorneys to Vincent, [plaintiff] and Olsman. [Plaintiff] had high

---

[2] Along the same lines, promissory estoppel requires "(1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promise, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided." *Cove Creek Condo Ass'n v Vistal Land & Home Dev, LLC*, 330 Mich App 679, 713; 950 NW2d 502 (2019).

success on a similar case in another county. [Defendant] was not recommended by Damm.

The family, with Vincent, interviewed many lawyers, including [defendant]. The family ultimately retained [defendant], in part because he knew Vincent and in part because he agreed to reduce his fee by 1/3 in lieu of any referral fee to be paid to Vincent.

[Defendant] did not disclose his representation of Williams to [plaintiff]. When [plaintiff] learned of it and confronted [defendant,] [defendant] responded it was a payback for an earlier affront or hurt. [Plaintiff] may have been a contender to be the lawyer on the case, but such choice is that of the client. Moreover, the referral fee was given up by [defendant] to secure the case.

Regarding the Aljabli matter, the trial court stated:

[Aljabli] was referred to plaintiff's associate, Ronald Bowling, by attorney Jennifer Englehardt. Englehardt did so because she was: (i) familiar with Bowling's work, and (ii) she believed he worked for Meyers. . . . See Englehardt affidavit.

Englehardt attested she litigated . . . a similar wrongful death case which was defended by Bowling and she was impressed with his work. She referred the case to Bowling after notifying [defendant] and Bowling. She also referred several other cases to [defendant]. Her law firm had a relationship with [defendant] which existed before she joined the firm. Englehardt never referred a case to [plaintiff]. The [Aljabli] referral was based on her mistaken assumption that [defendant] and Bowling worked together. Moreover, she attested she would have not referred the case to Bowling, or would have handled the case differently if she knew [defendant] and Bowling did not work together.

Englehardt's misapprehension was no fault of [plaintiff's]. Englehardt admitted she sent the case to Bowling as she mistakenly believed he worked for [defendant]. She was wrong. The choice of counsel is that of the client and the case is required to be where the client chooses. The evidence shows [defendant] was the client's ultimate choice.

Upon review of the entire record, including the evidence that plaintiff submitted in opposition to defendant's motion for summary disposition, we agree with the trial court that plaintiff has presented no evidence that either referral source belonged to him or intended to refer him to their prospective clients. Similarly, plaintiff has not established that defendant interfered with any referral source—only that "he competed for the case, maybe with knowledge [plaintiff] was a potential choice." As the trial court correctly concluded:

[I]t is clear from the evidence that in the Williams case [plaintiff] was a potential attorney. The client chose [defendant]. It was not that [plaintiff] was not a good selection, … he was just not [Vincent's] or the client's preferred selection. Moreover, the choice of [defendant] was made in part by [defendant's] agreement

to reduce his fee in lieu of giving Williams a referral fee. Apparently, the client found this an attractive or compelling reason to hire [defendant]. But none of these facts show [defendant] interfered with [plaintiff's] case, only [plaintiff] expected a "hands off" policy where he was in the running. Plaintiff has not demonstrated [defendant] interfered, only that he competed for the case, maybe with knowledge [plaintiff] was a potential choice.

The medical malpractice case, [Aljabli], was originally sent to [plaintiff's] associate, Bowling. The choice of counsel is up to the client. The motive of sending the case to Bowling does not negate or trump the choice of counsel is up to the client.

Therefore, the record does not support plaintiff's arguments on appeal that there remains a genuine issue of material fact regarding his claims for breach of contract or tortious interference. Or, for that matter, promissory estoppel.

## V. BREACH OF FIDUCIARY DUTY

Plaintiff argues that summary disposition was inappropriate on his claim that defendant breached his duty to the PLC when he launched a competing website and installed a separate phone message system. We disagree.

The parties agree that the PLC is subject to the LLCA, which imposes certain fiduciary duties on company managers. In particular, MCL 450.4404(1) requires that "[a] manager shall discharge the duties of manager in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the manager reasonably believes to be in the best interests of the limited liability company." By this provision's plain language, these duties generally are owed to the limited liability company, not to the individual members. See also *Frank v Linkner*, 310 Mich App 169, 180; 871 NW2d 363 (2015), aff'd in part, rev in part on other grounds, 500 Mich 133; 894 NW2d 574 (2017).

When a member of the company wishes to commence a suit in the right of a limited liability company, the member must adhere to several statutory prerequisites, including making a written demand on the breaching member and waiting until the rejection of the demand—or the passage of 90 days, whichever is earlier. MCL 450.4510.

In the present case, the parties agree that they are the sole members of the PLC and that they share management responsibilities. Accordingly, both parties owe a fiduciary duty of loyalty to the PLC to act in its best interests. See MCL 450.4404. However, plaintiff failed to create a genuine issue of material fact that defendant breached any such duty to the PLC.[3] Plaintiff's allegations simply do not demonstrate that defendant acted in a way that was not in the PLC's best interests. Assuming arguendo that defendant created a separate website and installed a separate

---

[3] Plaintiff does not include any separate law or facts pertaining to his allegation of a common law breach of a duty of loyalty. As such, we treat that aspect of plaintiff's argument as abandoned. See *People v Solloway*, 316 Mich App 174, 198; 891 NW2d 255 (2016).

phone line, the record supports that all business that may have been generated by this conduct was executed in the name of the PLC. In other words, all of defendant's clients were clients of the PLC. As such, defendant's conduct did not usurp business from the PLC—defendant was operating within the PLC, rather than competing with it.

The record also does not support plaintiff's allegations that defendant misappropriated PLC funds by billing his "separate" and "competing" advertising expenses to the PLC's general expenses. Defendant testified that he billed his advertising expenses to his own profit center. And in his response to plaintiff's request for admission, defendant stated that "all expenses were charged through the firm to [defendant's] separate profit center as provided in the written agreement between the parties." Finally, plaintiff's own deposition testimony was that he had been charged for some of defendant's expenses, apparently related to advertising, but that the charge may have been an accident or a mistake—either by defendant or the parties' bookkeeper— and that the charge was corrected.

Likewise, even if plaintiff could establish that defendant's alleged conduct violated his duties to the PLC under MCL 450.4404—i.e., that defendant's conduct was done in bad faith without a reasonable belief that it was in the best interests of the PLC—plaintiff failed to follow the requirements of MCL 450.4510 before commencing his lawsuit. The statute is clear that plaintiff should have taken certain steps, such as sending defendant a letter of request. Plaintiff does not allege or present any evidence that this step was taken. Plaintiff does not cite any case law that excuses a member from the litigation prerequisites of MCL 450.4510 when, as here, two equal members manage the company.

On this point, plaintiff discusses only *Fassihi v Sommers, Schwartz, Silver, Schwartz & Tyler, PC*, 107 Mich App 509, 515–16; 309 NW2d 645 (1981). However, that case deals with "the difficult question of what duties, if any, an attorney representing a closely held corporation has to a 50% owner of the entity, individually." *Id*. at 514. That case does not address the duties that equal owners of a limited liability company may owe to each other, separate from the duties owed to the PLC. Consequently, *Fassihi* is not relevant.

Therefore, even with the benefit of additional discovery that potentially could expose actual breaches of defendant's fiduciary duties, plaintiff cannot establish that he complied with his statutory requirements or that there is a legal basis why he should be excused from compliance. Therefore, the trial court did not err by dismissing this claim.

## VI. WIND-UP COSTS

Lastly, plaintiff argues that the trial court incorrectly disregarded plaintiff's affidavits, in which he averred that the parties agreed that he would vacate the PLC's premises in exchange for defendant paying the tail insurance policy and that the parties orally agreed that he should be required to pay less than half of copying and rent expenses related to the PLCs' dissolution. We disagree.

As discussed, a contract requires an offer and unambiguous acceptance of terms mutually assented to by both parties. *Clark*, 309 Mich App at 394. And it was plaintiff's burden in this case to provide documentary evidence showing the existence of a disputable issue to avoid

-9-

summary disposition. *Novak*, 235 Mich App at 681. See MCR 2.116(G)(4). A party's pledge to establish an issue of fact at trial cannot survive summary disposition under MCR 2.116 (C)(10). *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999).

Plaintiff submitted several affidavits in support of his opposition to defendant's motion for summary disposition. In these affidavits, plaintiff stated that the parties equally divided expenses throughout each year for "purposes of convenience," but there was never any understanding between the parties that these expenses could not be reallocated proportionally among them in the event of the PLC's dissolution. To the contrary, according to plaintiff, the parties agreed in writing that each would be "personally and exclusively responsible for all expenses directly attributable to him" and settled any discrepancies at the end of the year.

Indeed, the parties entered into five written agreements, as previously described. In the first agreement, the parties agreed that each member was "personally responsible for all expenses directly attributable to that member," and that each member was "also personally responsible for 50% of all other firm expenses." The second written agreement included the same language about firm expenses. The parties' third written agreement stated the following:

> Case costs advanced on a file shall be the property of the member responsible for the file and shall correspond to a loan made by the member to the firm.

> At the end of each calend[a]r year there shall be a reconciliation of case costs advanced during the previous calend[a]r year and case costs recovered during that year by each member.

In December 2013, the parties signed yet another agreement regarding case costs. Pursuant to this agreement, case costs attributable to the parties' respective "dockets" were owned by them individually and "at the end of each calendar year, there shall be a reconciliation of case costs advanced during the previous calendar year and case costs recovered during that year by each member." The parties' final written agreement regarding operation of the PLC was signed in December 2014, and it discussed only the treatment of plaintiff's operational shortfall for the 2014 calendar year.

Additionally, the parties' bookkeeper, Deters, averred the following facts:

> Over the years, the parties have always managed their practices as separate practices with limited shared expenses such as rent, salaries for certain shared employees such as the receptionist, and miscellaneous operating expenses such as copy costs not chargeable to a particular file. The parties also agreed that each member is personally responsible for all expenses directly attributable to that member.

> At the end of each year, each member has a case cost shortfall or surplus that is based on what the firm spent for that member's particular cases. In the case of a year end shortfall, the member typically pays the shortfall amount into the firm at the start of the following year, after which the cycle repeats itself.

-10-

Shared expenses such as rent, salaries for shared employees, and shared office expenses, have always been split equally and are reflected on the year end statement. These shared expenses have always included the firm's malpractice insurance premium even when the number of lawyers servicing a single member fluctuated.

After each member established his separate firm last February, I closed the books on Morgan & Meyers [PLC] on February 13, 2019. The numbers shown below reflect the amount each member owed for the period from January 1, 2018 through February 13, 2019. Common expenses such rent and salaries for shared employees total $53,520.66, and in keeping with the practice since 2003, I assigned each member one half of that or $26,760.33. All other amounts reflect individual expenses and case costs attributable only to that member.

This evidence supports that the parties equally shared certain operating expenses, including copying and rent, which were not generally attributable to a particular party via a particular client file. Despite plaintiff's affidavits, none of these agreements, nor the parties' pattern of practice, indicate that firm expenses would be *reallocated* in accordance to the proportion in which they were incurred in the event of a dissolution.

Regarding the malpractice tail policy, plaintiff repeatedly averred that he would vacate the parties' shared premises in exchange for defendant paying for the entire cost of the tail policy. Indeed, the parties' attorneys exchanged correspondence about this potential arrangement, but there is no evidence that they executed a written agreement to this effect or that the parties orally reached mutually agreeable terms in relation to the malpractice insurance tail policy. The parties' conduct supports a 50/50 split, when Deters averred that at the time of the dissolution, defendant had paid half of the policy premium and no other material evidence existed to the contrary.

Therefore, the evidence does not create a genuine issue of material fact either that plaintiff was not responsible for half of the rent and copying expenses not attributable to a particular file or that plaintiff was not responsible for half of the malpractice tail policy.

Affirmed.


/s/ Michael J. Riordan
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado