PEOPLE v SULLIVAN

Docket No. 199574. Submitted September 1, 1998, at Detroit. Decided September 11, 1998, at 9:00 A.M.

John L. Sullivan was convicted by a jury in the Bay Circuit Court, William J. Caprathe, J., of first-degree murder and of two counts of assault with intent to commit murder despite presenting an insanity defense. The defendant appealed.

The Court of Appeals *held*:

1. The trial court did not abuse its discretion by admitting into evidence the testimony of two psychiatrists at Bay Medical Center, where the defendant received medical treatment and underwent psychiatric evaluation shortly after he stabbed his wife, his children, and himself. The testimony was not subject to the physician-patient privilege, MCL 600.2157; 27A.2157, because the defendant had waived that privilege when he stipulated the entry of an order for discovery and psychiatric evaluation independent of that performed at the Center for Forensic Psychiatry, which order allowed access by the prosecuting attorney and an independent examiner to the defendant's medical and psychiatric records.

2. The trial court did not err in refusing to instruct the jury about voluntary manslaughter as a cognate lesser included offense of murder. The trial court correctly determined that the evidence presented at trial could not support a finding by the jury of provocation that would have caused a reasonable person to act out of passion rather than reason. The special traits of a particular defendant, e.g., mental disturbance, cannot be considered when determining whether there was provocation.

Affirmed.

HOMICIDE — MURDER — MANSLAUGHTER.

The provocation necessary to mitigate a homicide from murder to manslaughter is that which causes a reasonable person to act out of passion rather than reason; because provocation is measured under a "reasonable person" standard, special traits of a particular defendant, e.g., mental disturbance, are not relevant to the determination of adequate provocation.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Joseph K. Sheeran*, Prosecuting Attorney, and *Martha G. Mettee*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Gail Rodwan*), for the defendant on appeal.

Before: TALBOT, P.J., and FITZGERALD and YOUNG, JR., JJ.

FITZGERALD, J. Following a jury trial, defendant was convicted of first-degree murder, MCL 750.316; MSA 28.548, and two counts of assault with intent to commit murder, MCL 750.83; MSA 28.278. He was sentenced to life imprisonment without the possibility of parole for the murder conviction, and to life imprisonment for the assault convictions. Defendant appeals as of right. We affirm.

### FACTS

Defendant stabbed and killed his wife in the bedroom of their family home during the early morning hours of February 15, 1995. Defendant then entered the bedroom of his sleeping children and stabbed his son Jonathan in the chin and his daughter Amy in the neck. The two children, and their older sister Sarah, were able to leave the home and go to a nearby gasoline station to call the police.

Two volunteer firefighters who were dispatched to the gasoline station found defendant walking toward them on the road. Defendant was wearing only a pair of pants and had blood running down his stomach from self-inflicted knife wounds. When the firefighters offered medical assistance, defendant indicated that

he had just stabbed his wife and children and requested that they take care of them.

Defendant was taken to Bay Medical Center for surgery to repair his wounds. Dr. Richard Rahall, a general surgeon, asked Dr. Kishore Kondapaneni, a staff psychiatrist, to perform a psychiatric evaluation of defendant. Defendant was reluctant to speak with Dr. Kondapaneni, so Dr. Kondapaneni referred defendant to Dr. D. L. Foster, a staff psychiatrist. Dr. Foster saw defendant for approximately one hour on February 16, 1995. Dr. Foster concluded that defendant was mentally ill, but that he did not meet the criteria for involuntary hospital admission. His provisional diagnosis was "depressed mood with mixed anxiety." Dr. Foster recommended that a more thorough evaluation be conducted at a later time.

Dr. Kondapaneni spoke with defendant on two later occasions for approximately twenty minutes each time. Dr. Kondapaneni diagnosed defendant as suffering from "adjustment disorder with mixed disturbances of emotions and conduct." He concluded that defendant was not mentally ill, but recommended further psychiatric evaluation.

Defendant presented the defense of insanity. In support of the defense, defendant offered the testimony of Dr. Ronald Lewis of the Center for Forensic Psychiatry. Dr. Lewis examined defendant pursuant to a court order for the purpose of determining whether defendant was legally insane at the time of the incident. Dr. Lewis concluded that defendant lacked substantial capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law.

Defendant also presented the testimony of Dr. Michael Abramsky, an independent psychologist. Dr. Abramsky concluded that defendant was insane at the time of the incident and that he suffered from severe dysthymia with psychotic episodes.

To rebut defendant's insanity defense, the prosecution presented the testimony of Drs. Foster and Kondapaneni. Defendant moved to have both doctors stricken as prosecution witnesses on the ground that their testimony would violate the doctor-patient privilege. The trial court denied the motion to strike, ruling that defendant had waived the privilege.

The prosecution also offered the testimony of an independent forensic psychologist, Dr. Charles Clark. Dr. Clark interviewed defendant on April 25 and September 6, 1995. Dr. Clark concluded that defendant had a character disorder that did not fit the definition of insanity. He concluded that defendant suffered from a "long-standing maladaptive adjustment" involving social isolation, peculiar thinking, depression, and anxiety.

Defendant requested an instruction on voluntary manslaughter on the ground that the stabbings were the result of provocation. Defendant conceded that any evidence of provocation that was presented was not sufficient to provoke a "reasonable person." Defendant argued, however, that the law should take into account, in measuring the adequacy of the provocation, defendant's special mental qualities. The trial court denied the request, concluding that the requisite provocation must be such that it would cause a *reasonable person* to lose control.

I

Defendant contends that the testimony of Drs. Foster and Kondapaneni was inadmissible because it was protected by the physician-patient privilege. We review a trial court's decision regarding the admission of evidence for an abuse of discretion. *People v Gould*, 225 Mich App 79, 88; 570 NW2d 140 (1997).

Pursuant to defendant's notice of intention to assert the defense of insanity, defendant was ordered on August 9, 1995, to undergo an examination relating to his claim of insanity by personnel of the Center for Forensic Psychiatry. MCL 768.20a(2); MSA 28.1043(1)(2).

On October 26, 1995, a "stipulation and order for discovery and independent psychiatric evaluation" was entered. The stipulation provided:

"It is HEREBY Stipulated and agreed between the parties that the attached Order for Discovery and Independent Psychiatric Evaluation be entered pursuant to MCLA 768.20a(3) [MSA 28.1043(1)(3)] which allows the Prosecuting Attorney and Defense Attorney to obtain an independent psychiatric evaluation following an evaluation from the Center for Forensic Psychiatry. IT IS FURTHER STIPULATED And agreed between the parties that, in order for a thorough independent psychiatric evaluation to be done, it is necessary that any and all records pertaining to the Defendant, John L. Sullivan, including but not limited to the following: medical records, psychiatric records, nurses' notes, attendants' notes, and any other reports/notes either in the possession of or generated by the Center for Forensic Psychiatry, Bay Medical Center, Bay-Arenac Community Mental Health, and/or Caro State Hospital, be submitted to the Bay County Prosecuting Attorney's Office and Defense Attorney within 14 days of this Order.

Pursuant to the above stipulation, defendant's medical records from Bay Medical Center were provided to the prosecution's independent examiner, Dr. Charles Clark. Dr. Clark concluded that defendant had a character disorder that did not fit the definition of insanity. In forming his opinion, Dr. Clark relied on two interviews with defendant, as well as the results of standard psychological tests, review of police and medical records, and reports of other medical experts at trial.

In the "Notice of Rebuttal of Insanity Defense," the prosecution listed Drs. Foster and Kondapaneni, among others, as witnesses to rebut defendant's insanity defense. Defendant moved to strike Drs. Foster and Kondapaneni as witnesses on the grounds that their testimony was protected by the physician-patient privilege and was not relevant to the issue of defendant's sanity because these doctors were consulted only with respect to defendant's suicidal tendencies immediately after the incident occurred. The prosecutor responded that defendant's signed release of his medical records for the purpose of an independent evaluation by Dr. Clark waived the privilege with respect to any medical information used by Dr. Clark in formulating an opinion regarding defendant's criminal responsibility at the time of the incident. The trial court agreed with the prosecutor and denied defendant's motion to strike Drs. Foster and Kondapaneni.

MCL 600.2157; MSA 27A.2157 provides in relevant part:

> Except as otherwise provided by law, a person duly authorized to practice medicine or surgery shall not disclose any information that the person has acquired in attending a patient in a professional character, if the infor-

mation was necessary to enable the person to prescribe for the patient as a physician, or to do any act for the patient as a surgeon.

The privilege protects the confidential nature of the physician-patient relationship. Defendant gave up this protection when he authorized the release of all medical records regarding his mental health for use by the prosecutor's independent examiner in evaluating defendant's sanity at the time the offense was committed. Clearly, defendant recognized that the independent expert would rely on historical data, including information from other practitioners who had evaluated defendant's mental health status for reasons unrelated to the present offense, when forming an opinion regarding defendant's sanity at the time of the offense. Defendant contends, nonetheless, that the release of medical information did not waive the privilege with respect to testimony by Drs. Foster and Kondapaneni.

In *Sterling v Keidan*, 162 Mich App 88, 98; 412 NW2d 255 (1987), a case involving the attorney-client privilege, the Court declined to find an implied waiver of the privilege where there was an *inadvertent* disclosure of information. The Court stated, however:

> We distinguish this situation, involving mere inadvertence, from a situation involving an error of judgment where the person knows the information is being released but concludes that the privilege will survive for whatever misguided reason. Such an error of judgment will destroy the privilege. [*Id.*]

Defendant's mental state at the time of the offense was the central issue at trial. There is no dispute that defendant voluntarily released his medical records to

the prosecution for the purpose of an independent evaluation regarding defendant's sanity at the time of the offense. The voluntary release of this information waived the privilege with respect to such information. The reason is logical: After claiming the defense of insanity and authorizing the release of medical information, defendant can no longer claim an intent to preserve the sanctity of the physician-patient privilege. Hence, the testimony of Drs. Foster and Kondapaneni was properly admitted because the physician-patient privilege was waived when defendant released his medical records. See generally *Domako v Rowe*, 438 Mich 347; 475 NW2d 30 (1991).

II

Defendant argues that the trial court erred in failing to give an instruction regarding voluntary manslaughter. This court reviews the record adduced at trial to determine whether the evidence was sufficient to convict the defendant of a cognate lesser included offense. *People v Cheeks*, 216 Mich App 470, 479-480; 549 NW2d 584 (1996).

The trial court has a duty to instruct the jury with respect to the law applicable to the case. MCL 768.29; MSA 28.1052. This duty depends on the evidence presented at trial. This case deals with a cognate lesser included offense. A cognate lesser offense shares several elements and is in the same class of offenses as the greater crime, but differs from the greater crime in that it contains some elements not found in the higher offense. *People v Jones*, 395 Mich 379, 387; 236 NW2d 461 (1975). If the evidence presented would support a conviction of a cognate lesser offense, the trial court, if requested, must

instruct on it. *People v Van Wyck*, 402 Mich 266, 270; 262 NW2d 638 (1978).

MCL 750.321; MSA 28.553 specifies the punishment for the crime of manslaughter. However, it is the common law that defines the crime. *People v Pouncey*, 437 Mich 382, 388; 471 NW2d 346 (1991). The elements of voluntary manslaughter are (1) the defendant must kill in the heat of passion, (2) the passion must be caused by an adequate provocation, and (3) there cannot be a lapse of time during which a reasonable person could control his passions. *Id.; People v Hess*, 214 Mich App 33, 38; 543 NW2d 332 (1995). The element of provocation distinguishes the offense of manslaughter from murder.

The provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason. *People v Townes*, 391 Mich 578, 590; 218 NW2d 136 (1974). Case law has consistently held that the provocation must be adequate, namely, that which would cause a *reasonable person* to lose control. *Id.*

The determination of what is reasonable provocation is a question of fact for the factfinder. *Id.* at 589. However, the court furnishes the standard of what constitutes adequate provocation, i.e., that provocation that would cause a reasonable person to act out of passion rather than reason. Where, as a matter of law, no reasonable jury could find that the provocation was adequate, the court may exclude evidence of the provocation. *Pouncey, supra* at 390.

The trial court refused to instruct regarding voluntary manslaughter, concluding that no reasonable jury could find that the provocation was adequate to cause a reasonable person to act out of passion.

Defendant does not dispute the trial court's finding. Defendant argued, however, that he is *not* a reasonable person and that the jury should be entitled to take his weakness of mind into account in determining the adequacy of the provocation.

The common law measures provocation under a reasonable person standard. See generally 2 Wharton's Criminal Law (15th ed), § 166, pp 366-368. According to this rule, provocation is adequate only if it is so severe or extreme as to provoke a reasonable man to commit the act. *Id.* Thus, it is quite uniformly held that a defendant's special mental qualities are not to be considered in measuring the adequacy of provocation. LaFave & Scott, Criminal Law (2d ed), § 7.10, p 659.

Case law in Michigan, which has also looked to the common law for the definition of manslaughter, requires that the provocation be sufficient to excite passion in a "reasonable man." Indeed, in *Pouncey, supra* at 389, n 7, the court stated:

> "If reasonableness were not required, a man who flew into a rage and killed a woman for refusing to have sex with him would be guilty of nothing more than manslaughter. Furthermore, when the law rewards irrational behavior, it encourages people to feign irrationality. Thus, if the man in the above hypothetical [a man who flies into a rage at the slightest insult] had coolly decided to kill the woman as punishment for her refusal, he would be encouraged to feign rage in order to mitigate his crime." [Citation omitted.]

Thus, by definition, any special traits of the particular defendant cannot be considered. The fact that defend-

ant may have had some mental disturbance is not relevant to the question of provocation.[1]

Furthermore, where a defendant is convicted of first-degree murder, and the jury rejects other lesser included offenses, the failure to instruct on voluntary manslaughter is harmless. *People v Beach*, 429 Mich 450, 481, 490-491; 418 NW2d 861 (1988); *People v Zak*, 184 Mich App 1, 16; 457 NW2d 59 (1990). Here, the jury rejected a verdict of second-degree murder, as well as verdicts of guilty but mentally ill of first-degree and second-degree murder.

Affirmed.

---

[1] In support of his argument, defendant relies on *Maher v People*, 10 Mich 212, 220 (1862), in which the Court stated:

> In determining whether the provocation is sufficient or reasonable, *ordinary human nature*, or the average of men recognized as men of fair average mind and disposition, should be taken as the standard—*unless, indeed, the person whose guilt is in question be shown to have some peculiar weakness of mind or infirmity of temper, not arising from wickedness of heart or cruelty of disposition.* [Emphasis added.]

The italicized language above has effectively been overruled by affirmation of the reasonable man standard in *Pouncey, supra.* Defendant also relies on CJI2d 16.9(2), which provides that for manslaughter to be present:

> [W]hen the defendant acted, his thinking must be disturbed by emotional excitement to the point that an ordinary person might have acted on impulse, without thinking twice, from passion instead of judgment. This emotional excitement must have been the result of something that would cause an ordinary person to act rashly on impulse. The law doesn't say what things are enough to do this. That is for you to decide. [*If the defendant is mentally or emotionally impaired, you may consider that.*] [Emphasis added.]

However, the standard jury instructions do not have the official sanction of the Michigan Supreme Court. *People v Petrella*, 424 Mich 221, 227; 380 NW2d 11 (1985). Even more important, in light of *Pouncey*, it is clear that CJI2d 16.9(2), to the extent it permits the jury to consider a defendant's mental or emotional impairment when determining whether adequate provocation exists to mitigate the offense of murder to voluntary manslaughter, misstates Michigan law and we expressly disavow it. Thus, defendant's reliance on this erroneous instruction is unavailing.