### PEOPLE v ELKHOJA

Docket Nos. 224126, 228734. Submitted February 5, 2002, at Lansing. Decided May 21, 2002, at 9:15 A.M. Leave to appeal sought.

Abdul G. Elkhoja was convicted by a jury in the Washtenaw Circuit Court, Donald E. Shelton, J., of manslaughter and possession of a firearm during the commission of a felony. Intervening plaintiff the city of Ann Arbor appealed by leave granted from an order denying the city's motion to quash an order granting the defendant's motion for discovery that ordered the prosecutor to submit to the Ann Arbor Police Department a list of names of all civilian witnesses the prosecution intended to call and certain res gestae witnesses for the purpose of obtaining the criminal records and histories of those witnesses from the Michigan Law Enforcement Information Network (LEIN). The city claimed that there was no legal authority for the discovery order and the city was prohibited by statute and administrative rules from providing the information for the purpose of discovery by the defendant. (Docket No. 224126). The defendant appealed as of right from his convictions. (Docket No. 228734). The appeals were consolidated.

The Court of Appeals *held*:

1. The trial court erred in finding that the city lacked standing to contest the discovery order. Both MCR 2.302(C)(1) and 2.506(H)(1) provide the city with standing to appear.

2. The LEIN act, MCL 28.211 *et seq.*, and the applicable administrative rules governing disclosure of information from the LEIN system do not prohibit a court from ordering that LEIN information be given to the prosecutor and ordering that the prosecutor provide any exculpatory or impeachment information found therein to the defendant.

3. The trial court did not abuse its discretion in determining that the testimony of those witnesses covered by the discovery order would be excluded if the prosecutor and the city did not comply with the discovery order.

4. The court did not err in permitting the prosecutor to elicit from the witnesses evidence of prior bad acts of the defendant. The evidence was offered for a proper purpose, was relevant to an

issue of consequence at trial, and was more probative than prejudicial.

5. The evidence was sufficient to negate the defendant's claim of self-defense and support the jury's verdict of manslaughter.

6. The court did not abuse its discretion by denying the defendant's motion for a new trial that alleged that the verdict was against the great weight of the evidence.

Affirmed.

SAWYER, J., dissenting in part, stated that the court erred in ordering the disclosure of the LEIN information. No law or rule authorized the disclosure as ordered by the trial court. The city is not a proper party to raise the issue whether the court properly concluded that witnesses would be precluded from testifying if the prosecutor and the city did not comply with the discovery order. The order should be reversed in this regard.

1. EVIDENCE — DISCOVERY — STANDING.

A city has standing to contest a discovery order in a criminal case in which the city is not an original party where the order does not constitute a subpoena to the city or request the city to attend or do anything but, in reality, requires the city to take some action to comply with the order (MCR 2.302[C][1], 2.506[H][1]).

2. CRIMINAL LAW — DISCOVERY — LEIN Information.

A trial court, pursuant to a proper request, may order that a criminal defendant be provided information obtained through the Law Enforcement Information Network; the order would make the defendant an individual legally authorized to have access to the information (MCL 28.211 *et seq.*; 1981 AACS, R 28.5208[4]).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *Brian L. Mackie*, Prosecuting Attorney, and *David A. King*, Senior Assistant Prosecuting Attorney, for the people.

*Kristen D. Larcom*, for the city of Ann Arbor.

*Law Offices of KS Ernst, PLC* (by *Kevin Ernst* and *Daniel L. Villaire, Jr.*), for the defendant.

Before: FITZGERALD, P.J., and HOOD and SAWYER, JJ.

FITZGERALD, P.J. In Docket No. 224126, intervening plaintiff the city of Ann Arbor appeals by leave

granted the December 6, 1999, order of the Washtenaw Circuit Court denying its motion to quash that part of the court's October 25, 1999, order granting defendant Abdul Ghdier Elkhoja's motion for discovery. In Docket No. 228734, defendant Elkhoja appeals as of right his jury convictions of manslaughter, MCL 750.321,[1] and possession of a firearm during the commission of a felony, MCL 750.227b, for which he was sentenced to prison terms of four to fifteen years and two years for the respective convictions. The appeals were consolidated. We affirm.

FACTS PERTINENT TO DOCKET NO. 224126

On September 28, 1999, defendant appeared before the court on three motions. In pertinent part, he requested the criminal records and criminal histories of all the civilian witnesses the prosecutor intended to call at trial and those the defense had listed in its request for assistance in producing res gestae witnesses. Specifically, defendant sought information regarding any felony convictions that occurred in the previous ten years involving theft, dishonesty, or false statement to enable defendant to challenge the witnesses' credibility.

The prosecutor objected to the request, noting that it would be a great burden to run computerized criminal histories (CCHS)[2] on all the witnesses and that

---

[1] Defendant was originally charged with open murder. MCL 750.316. The trial court dismissed that charge and instructed the jury on the elements of second-degree murder, manslaughter, and self-defense.

[2] 1981 AACS, R 28.5101(e) provides:

"Computerized criminal history," known as CCH, means information which is collected on individuals by criminal justice agencies, which is maintained in LEIN [Law Enforcement Information Net-

MCR 6.201 did not require the prosecutor to run CCHS on all witnesses. The prosecutor indicated that he had not run CCHS on any of the witnesses and did not intend to do so. The trial court granted the motion for discovery and ordered the prosecutor to "submit a list of names of all civilian witnesses to the Ann Arbor Police Department for the purposes of obtaining a computerized criminal history for such witnesses to the extent that such records are kept in the Michigan Law Enforcement Information Network [LEIN]."

The city of Ann Arbor and the Ann Arbor Police Department filed an appearance and a motion to quash the discovery order "to the extent that it . . . require[s] production of computerized criminal histories to the extent they are available in the [LEIN] for all civilian witnesses." The city claimed that MCL 28.211 *et seq.*, and applicable administrative rules governing disclosure of information from the LEIN system prohibited the Ann Arbor Police Department from providing that information for the purpose of discovery by a criminal defendant. The city also claimed that there was no legal authority for the discovery order. The trial court denied the motion to quash.

On December 29, 1999, this Court granted the city's application for leave to appeal and granted the city's motion to stay the trial court's discovery order. On January 10, 2000, the parties, including the city, appeared before the trial court. The court stated:

---

work] and NCIC [National Crime Information Center] computer files, and which consists of identifiable descriptions and notations of arrests, detentions, indictments, informations, or other formal criminal charges and any dispositions arising therefrom.

The Court of Appeals, apparently at the instance of the City of Ann Arbor, stayed the [c]ourt's order for production of prior conviction information as to the witnesses in this case. In view of that . . . the Defendant requested further time to prepare this case. I'm going to allow that. I'll set a pre-trial—a final pre-trial in this matter on January the 18th at 1:30. However, you should all know that if there is no plea agreement on that date, I intend to set a trial and proceed to trial. I'm going to say one more time, it's a matter of fundamental due process that the witnesses whose criminal records have not been disclosed are not going to testify in this case.

FACTS PERTINENT TO DOCKET NO. 228734

On the first day of trial, defense counsel informed the court that he and the prosecutor had attempted to reach an agreement regarding providing the criminal histories of the prospective witnesses but that the information he received was not complete.[3] Therefore, defendant requested that the court either follow it's earlier ruling and refuse to allow the witnesses to be called or, in the alternative, continue the matter until the Court of Appeals resolved the appeal. The court ruled:

I need to make sure that this case proceeds to trial both in an orderly and in a timely way. We're going to proceed to trial. I am going to allow the defense considerable latitude beyond that normally allowed in the court rules in terms of cross examination of any of the prosecution witnesses with regard to potential criminal history since that information has not been provided.

---

[3] Defense counsel noted that the prosecutor provided the information he agreed to provide, but that the information supplied was not sufficient.

This issue of the criminal histories was not raised again in the trial.

The trial testimony indicated that, during the early morning hours of June 5, 1999, following a street fight between two groups of young men, Nicholas Seitz was killed by a .25 caliber gunshot wound to the chest. Defendant, a member of neither group, admitted firing the fatal shot, but claimed that he fired in self-defense after he was attacked by some of the young men while he was trying to break up the fight.

The first group consisted of men who were at a party at 909 East University Street in Ann Arbor. The second group consisted of men who were at a party on Willard Street and ended up at the apartment building on 1001 East University Street where Brett Wiater, Carter Williams and Craig Smith lived. The victim was a part of this second group.

### TESTIMONY OF THE FIRST GROUP

Matt East testified that he was doing a lot of drinking that night and also took LSD before he went to the party. He was feeling very hyper and antsy and having minor hallucinations. Justin Hill testified that when he got to the party around midnight, Matt East was on the porch yelling at about twenty to twenty-five fraternity members who were standing out in front of the house and wanted to come to the party. Thomas Anderson went down and apologized to the people. Matt East agreed that he got into a fight with the group of people who were walking by. Thomas Anderson and Andrew Soper both testified that Matt had been drinking heavily and was "kind of out of control." Matt East was bothering a lot of people, yell-

ing at people walking by the porch. He "seemed to be extremely interested in starting a fight." A man and a woman walked by, and Matt yelled at them. The man yelled back and came up to the porch. Matt responded by walking off the porch and hitting him in the face. The guy was knocked to the ground and said, "You're gonna die." The man who was hit and his girlfriend went into the apartment house next door at 1001 East University. Matt agreed that he said something to the man and his girlfriend. When the man said something back to him, he jumped off the porch and "socked him in the face." The man fell to the ground and said, "You're dead. You're dead"

Matt went over to the side of 909 East University. Justin Hill, Thomas Anderson, Tony Yoder, and Andrew Soper went there with him, trying to calm him down and get him to leave the party. Matt stated that about twenty to thirty people came out from the apartment house next door. Four or five of them were carrying forty-ounce glass bottles. They were yelling, "Who hit my brother?" Matt replied that he did, whereupon he was "mobbed on." He was hit with one of the bottles and fell to the ground. He curled up in the fetal position, and they kept hitting, kicking, and punching him. He feared for his life.

Thomas Anderson testified that, while he was standing by the side of the house, fifteen to twenty people came running out from the apartment building next door yelling, "Who hit my brother? Who hit my boy?" Anderson stepped back with his arms up and said, "I didn't hit anyone." Two people started hitting him in the head and he fell to the ground. He saw five or six pairs of shoes kicking him repeatedly in the head. One of the people had a telescoping baton and

hit him in the leg. He curled up in the fetal position to
protect himself, fearing for his life

Justin Hill testified that a lot of people rushed out
from the parking structure in the back of the apart-
ment house. He got hit in the head with a forty-ounce
bottle. He had no idea who hit him. A girl pulled him
away and told him to start walking, so he did.

When Andrew Soper was standing by the side of
the house, he saw a black Jeep Cherokee pull into the
underground parking garage behind the apartment
building. About a minute later, ten or twelve men
came running out of the apartment building. The man
who Matt had hit came out and yelled, "Who hit me?
Where's the guy that hit me? Soper saw two men
tackle Justin Hill and slam him into the side of the
house. Justin's shoulder broke through a window on
the side of 909 East University, then he was hit in the
head with a bottle. Two people slammed Soper into
the side of the house. He crouched down and then he
was hit with a bottle. Soper saw Matt East getting
kicked and stomped on by three or four men. Soper
pulled one of the men off Matt, and the man then hit
Soper. Soper also saw about four people stomping on
Thomas Anderson, who was on the ground.

Soper heard a gunshot and saw an orange flash. He
ran up on the porch and into the house and told
someone to call 911. When he came back outside, he
saw two people approaching a man who was backing
up. The person backing up pointed a gun at one of
the men approaching him and shot him.

Matt heard gunshots and a lot of yelling and
screaming, and the people who were hitting him ran
away. Anderson saw sparks fly out of a gun, and the
men stopped beating him. He saw a man walking

toward the sparks. He heard that person say, "What the f___ are you gonna do with that." When the second shot was fired, the men who had been assaulting Anderson ran. Anderson's leg was badly injured, but he managed to get up and make his way to a friend's car where he tried to calm down. Anderson believes that the shots saved his life. He was badly injured, especially on his calf where he was hit with the baton. Justin Hill heard "pop, pop" and people yelling and screaming as he was running away after being hit with the bottle.

## TESTIMONY OF THE SECOND GROUP

Brett Wiater left the party on Willard Street around 2:30 A.M. The party was a short distance from his apartment in 1001 East University, and he and his girlfriend, Mary Croft, walked home. As they passed 909 East University, someone hollered at them from the porch. He kept walking and tried to ignore it, but the man kept yelling. Finally, he turned around and said, "What did you say?" Several people came down from the porch, and one man hit him in his mouth with a fist. Brett stepped back, stunned. Mary Croft pulled at him to get him to go up to his apartment.

Craig Smith had returned from the party on Willard Street around 12:30 or 1:00 A.M. He was awakened when Brett and Mary returned to the apartment. Mary was crying, and Brett said that someone next door had hit him. Craig heard Brett use the telephone to call over to the party on Willard Street and tell them what had happened. He heard Brett say "get over here now."

Brett testified that he talked with Ryan Holdan and told him to tell the others what had happened. Christian Wiater, Clay Dietz, Phillip Vincenti and Nicholas Seitz drove to Brett's apartment in Christian's Jeep Cherokee. Ryan started jogging there with Elijandra Garcia. Brett greeted them at the apartment door and they all walked outside. Craig Smith stayed in the apartment. Brett agreed that he went out to confront the men next door. He was the first one out the door and was prepared to fight, now that the sides were "even." He stated that he confronted the first person who stepped forward as he approached, words were exchanged, and a fight ensued. Brett, Christian, Philip Vincenti, and Craig Smith all denied that they or any of their friends had any bottles, metal pipes, or weapons of any kind. Dietz was the only one of the men to testify that he was drunk at the time. Christian approached the first person that fit his brother's description of his assailant and asked if he was the one who hit his brother. They started fighting. Christian stated that after he hit that person a few times and the person fell down, he stopped fighting.

During the fighting, Brett saw Nicholas Seitz holding a man down. Brett went over and "kneed him in the face." However, when the man fell to the ground, neither Brett nor Nicholas continued to hit or kick him. Phillip Vincenti contended that he did not do any fighting that evening. He testified:

> I remember seeing Nick to my left, Brett to my right and I remember Nick kind of wrestling with a person. From my point of view, it wasn't an all out fight. It was more like wrestling . . . .
>
> The next thing I saw, the fight settled down and four, four young men walked into the yard off the sidewalk, off

the street, and up into the sidewalk. They were arrogant. They basically said, basically said chill out. They were much loud spoken though (sic). The next thing I knew maybe 10 to 15 seconds later I heard and saw a gun shot.

Phillip Vincenti ran to Brett's apartment. He heard a second shot as he was running up the stairs. Clay Dietz thought the shots came from a cap gun until he heard someone scream that Nicholas had been shot. He immediately ran to Brett's apartment and called 911.

Brett testified that, during the fight, he saw two men walk up from the sidewalk. One of the men held a gun up in the air and fired it. Brett immediately ran to his apartment. He did not hear a second shot. He learned from Carter Williams that Nicholas Seitz had been shot. Christian Wiater testified that he saw a person fire a gun into the air. People scattered, and he heard Nicholas say, "Is that a cap gun?" The person replied, "This ain't no f___ing cap gun." Christian testified that Nicholas did not advance on the shooter. The shooter lowered the gun and fired at Nicholas and then ran across the street.

Craig Smith testified:

> Well, during all of this fighting someone came and just kind of appeared and came into the courtyard and said you guys need to chill out. And it was said in kind of a hostile tone. And me and Chris approached him and he pulled a gun out and shot in the air. And from there I ran and a bunch of other guys ran. We went back up to the apartment . . . . About five minutes later Mary came up and told us that Nick had been shot.

Ryan Holdan heard the first shot as he was jogging down East University, on the way to Brett's apartment. He thought he heard Nicholas Seitz say, "What

is that, a cap gun?" Then he heard a voice say, "This ain't no f___ing cap gun." Then he heard a second shot, and people scattered in every direction. As he approached, he saw Nicholas crumple and fall to the ground. Carter Williams walked from the Willard party. By the time he got to the area, Brett and some others were running toward him and told him to run, that a man had a gun. Ryan Cook and Stephen Lewis both testified that by the time they got to Brett's, the police cars and ambulances were there and Nicholas was on the ground. Bernardo Rojas also walked back to Brett's apartment with Ryan Holdan and Elijandra Garcia. By the time they got there, Nicholas had already been shot.

### TESTIMONY OF DEFENDANT AND HIS FRIEND

Ariel Cunningham testified that he and defendant got together at Cunningham's house on June 5, around 12:30 or 1:00 A.M. After about three hours of partying at two different locations, they were walking on East University, back to Cunningham's place, when they heard a fight going on across the street. They heard bottles being broken and people yelling. They walked across the street to see what was going on. Defendant ran over and tried to help someone who was getting beaten up. Cunningham saw two people on the ground "getting beat down by eight other people." On his right, he saw four men beating up one man, and on the other side he saw "two on one." Defendant tried to pull off one of the men who were beating on a man on the ground. The men then turned and started coming after defendant. Cunningham saw that defendant had a handgun. Defendant fired a warning shot. Cunningham explained:

It was like just straight up in the air at the same time the guy who was like coming toward him was like looking straight at him, he was like right in front of him coming right toward him as he fired the shot in the air.

The guy kept coming after defendant until he got within arm's reach.

Ghdier [defendant] started backing up and I guess he was saying something to him. They were talking and the guy kept coming forward, approaching Ghdier like he was trying to do something to him.

\* \* \*

He [got] even closer and Ghdier was like backed up because it was in between an apartment building and a house. He was backed up against like near the house. He just lowered it to him and I guess he told him, back up or whatever and the guy just kept moving forward. I guess he didn't believe like it was a real gun or whatever.

The men kept coming and, when one was within a foot or two, he started to bring his hands up and the shot was fired. Defendant started running.

About fifteen minutes later, defendant came to Cunningham's house. Defendant was shaken. When Cunningham asked what had happened, defendant told him not to worry about it and stated that he needed to get home. Somebody came and took him. Later that night, Cunningham called defendant. Defendant told him that he really didn't mean to do what he did and was really worried. He hoped that the person he shot had not died. He said that he shot in self-defense.

Defendant testified on his own behalf. He said that as he and Cunningham were walking back to Cunningham's house, they heard yelling and bottles breaking across the street. They crossed the street. When he got to the sidewalk, he noticed four or five

guys on top of one person. There was "a whole bunch
of people in the area." Three guys were kicking and
punching the man on the ground and somebody hit
the man with a stick or something in his hand. He did
not know any of the people. Defendant continued:

> After I seen the guy to my left . . . hit him with something
> in his hand, I didn't know what it was, I decided it needed
> to stop. So I went over to the fight and started pulling peo-
> ple off.
>
> *          *          *
>
> The closest guy to me, I just grabbed him and pulled him
> back. And I was going ahead to start pushing the second
> guy out of the way. I was telling them to break it up. Some-
> body had pushed me from behind. I'm assuming it's the guy
> I had pulled off first.

Defendant stumbled forward, and when he caught
his balance, he stood up and turned around. Three of
the guys had turned their attention to him and they
started coming at him. He told them to "chill out":

> But they didn't stop and they had me like I couldn't see
> nothing in front of me. I could just see one dude to my right
> kind of and two this way . . . .
>
> While they were advancing, I pulled out a gun from my
> pocket. I cocked it and shot it in the air.

The men continued to come at him, and he was
scared because he thought that they were about to
jump him. He pointed the gun straight at them and
told them again to "chill out." They continued to
approach, and defendant was unable to back up fur-
ther. One man reached for defendant's hand, and
defendant shot him to protect himself. The man
stepped back, and defendant heard people say, "My

friend has been shot." Defendant panicked and started running, throwing the gun away as he ran.[4] Eventually, he got back to Cunningham's place and got a ride home from some people who lived next door. When he got home, his brother was sleeping and he didn't want to tell his parents what had happened, so he called Asad Tarsin and told him what had happened. Asad Tarsin corroborated defendant's testimony that defendant called him during the early morning of June 5 and told him what had happened.

Defendant stated that about two hours after he got home, the police came and got him. Initially, he denied having shot anyone because he was too scared to admit it. He had never before seen the person that he shot and had no malice or ill feelings toward him. Defendant explained why he carried a gun when he went out to parties and nightclubs:

> About two years ago I was in a nightclub with a cousin of mine and two friends, we had got in a fight. And eventually the night [sic] ended. We were going home. In the parking lot a car pulled up on us and a man jumped out the car and started shooting at us. And we started scattering. I hit [sic] between a car and my other cousin was laying on the other side of the car, and I saw this man walk up to my cousin and shoot him in the back. And I didn't do anything. I sat there and watched it . . . .

> About a year after that incident, I pretty much blamed myself a lot for my cousin taking that second shot because I didn't do anything. I pretty much, I kept to myself a lot and then eventually I met Ariel and started hanging around with my friends again and I bought a gun.

---

[4] The handgun was never recovered.

TESTIMONY OF THE POLICE

Sgt. Myron Blackwell testified that on his way to the scene he observed Justin Hill walking down the middle of the street, yelling obscenities. His head was bleeding and he had blood on his hands and t-shirt. He appeared intoxicated and was very belligerent and directed obscenities at Blackwell and Sgt. Craig Flocken. Blackwell instructed another officer to arrest Justin Hill. When he approached the scene there was a crowd of fifty to seventy-five people running around crying and yelling. There were small fights going on, people pushing and yelling at each other.

After he used tape to cordon off the crime scene, there were several people who were crying and yelling obscenities and trying to get into the crime scene and head toward the body. Several people were arrested for crossing into the crime scene. Stephen Lewis was the first. He appeared to be intoxicated and was yelling obscenities at the police officers. He resisted arrest. Brett Wiater was very emotionally upset and "probably intoxicated also." He was crying and yelling obscenities and trying to get into the crime scene. He was arrested. Christian Wiater was upset because his friend had been shot and his brother had been arrested. He felt that the police had used unnecessary force to arrest his brother. Christian began running around, trying to get into the crime scene, yelling obscenities at the police officers. He appeared to be intoxicated. He too was eventually arrested. He resisted arrest. Ryan Cook was arrested for going into the crime scene. He also was running around, yelling obscenities.

Police Officer Jeffrey Flynn observed a chaotic and traumatic situation when he arrived on the scene. There were more than fifty people there and they were hysterical, fighting, and yelling. He recognized Soper and approached him. Soper told him that "a whole army" had responded to an earlier altercation, but stated that no weapons of any kind were used by anyone other than the person who fired the handgun. Soper told him "the person with the gun approached the person being shot."[5]

Sgt. Craig Flocken was the first police officer on the scene. He thought there were between seventy-five and one hundred people. He observed broken glass in various sections of the scene. The people around the scene appeared intoxicated. Justin Hill ran up and started yelling at the people who were standing around Nicholas Seitz. Hill was bleeding from a large cut on his forehead. Some heavily intoxicated people in the area started to fight with Justin Hill, and Flocken had to separate them.

Detective Laura Burke interviewed Phillip Vincenti and Ryan Holdan at the hospital around 4:00 A.M. Both men told her that they did not see what happened but they had heard shots. Detective Richard Stern interviewed Justin Hill on June 5, 1999, at the Ann Arbor Police Department. Stern's testimony about what Hill told him was entered for impeachment purposes.

> Mr. Hill was very adamant when I interviewed him that he knew nothing about the incident. That he was struck in the head with an unknown object by an unknown person.

---

[5] The court instructed the jury that the testimony was permitted only for a limited purpose because "Mr. Soper testified differently than this earlier in the trial." The court instructed the jury to consider it only for credibility.

That he then got up and was walking away from the scene
when he heard two gunshots. He was very adamant that he
was not present at the scene when the gunshots took place
and knew nothing about what happened.

When Stern interviewed Soper, Soper did not men-
tion anything about any weapons being used during
the fight. When Stern first interviewed defendant,
defendant denied any involvement and stated that he
knew nothing about the incident or any shooting,
even when Stern suggested that there could possibly
be a self-defense claim. Stern stated that, after defen-
dant was told that someone had identified him, defen-
dant said that he would tell the truth. However,
defendant made no admissions to Stern and did not
make a written statement. Defendant has changed his
appearance since the incident by removing his facial
hair and changing his hairstyle. Nicholas Seitz was
about six feet tall and weighed between 180 and 200
pounds.

### TESTIMONY OF INDEPENDENT WITNESSES

Taehwan Kim was in his bedroom in the basement
of 909 East University. He woke up to sounds of yell-
ing. He heard some guy say, "You hit my brother." He
checked his clock and it was 3:00 A.M. He then heard
two gunshots. Kevin Fillion was in the bedroom of his
girlfriend's apartment on the second floor at 909 East
University when he heard a commotion outside. He
heard a couple of gunshots that sounded like fire-
crackers. He got up and looked out the window and
saw someone lying on the sidewalk surrounded by a
lot of people. Maura Seale was in 909 East University,
in the room she shared with Stephen Ross. Around

2:30 to 3:00 A.M., they both heard people yelling, bottles breaking, and a fight. Maura heard someone yell "white honky bitch"; then they both heard a couple of shots. Stephen Ross stated: "[A] group of people were making noise down by that entrance. And eventually it escalated into a bunch of bottles breaking and a fight and then a couple gun shots." "It sounded like bottles because they were very distinct crashes. They were separated." It was a very short time "between the time of the yelling and bottles breaking to the shooting." He heard a girl scream, "He shot him."

I. DOCKET NO. 224126

A

The city argues that the trial court erred in finding that the city lacked standing to contest the discovery order that required the city to take some action in this criminal case. Whether a party has standing is a question of law subject to review de novo. *Gyarmati v Bielfield*, 245 Mich App 602, 604; 629 NW2d 93 (2001).

The city relies on MCR 2.506(H)(1) in support of its argument that it had standing. MCR 2.506(H)(1) provides: "A person served with a subpoena or order to attend may appear before the court in person or by writing to explain why the person should not be compelled to comply with the subpoena, order to attend, or directions of the party having it issued."

Here, the court's order did not constitute a subpoena to the city, nor did it request that the city attend or do anything. However, the city asserts that, in reality, it is "compelled to comply" with the order. Because the city would be "compelled to comply"

with the court's order, MCR 2.506(H)(1), it "may appear before the court in person . . . ." Thus, this rule provides the city with standing to appear.

The city also relies on MCR 2.302(C)(1) for the proposition that "a nonparty has standing to seek protection by court order from requested discovery." MCR 2.302(C)(1) provides:

> Protective Orders. On motion by a party or by the person from whom discovery is sought, and on reasonable notice and for good cause shown, the court in which the action is pending may issue an order that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following orders:
> (1) that the discovery not be had.

This court rule permits a nonparty to file a motion in a case asking that the court order that a request for discovery not be had. In light of the city's argument that the court's order directs it to produce the criminal histories of the civilian witnesses, MCR 2.303(C)(1) would also provide the city with standing to appear before the court to contest the order.

B

The city contends that the LEIN statute and applicable rules promulgated to implement the act prohibit it from releasing criminal histories derived from the LEIN for purposes of discovery by a criminal defendant.

This issue was addressed in *People v Mack*, 218 Mich App 359; 554 NW2d 324 (1996), nullified 455 Mich 865 (1997). In *Mack*, the defendant argued that the trial court erred in failing to order the prosecutor to provide his trial counsel with the criminal histories

of the prosecution's witnesses available through the LEIN. After noting that a "failure of justice would result if defendant were precluded from obtaining information available to, and used by, the prosecution," *id.* at 362, this Court rejected the prosecutor's argument that the defendant may not receive the records in question pursuant to 1981 AACS, R 28.5208-R 28.5210. This Court held:

> Our reading of the relevant rules leads us to the conclusion that LEIN information may be provided to a criminal defendant pursuant to a court order. In reaching this conclusion, we apply principles of statutory construction. *Attorney General v Lake States Wood Preserving, Inc*, 199 Mich App 149, 155; 501 NW2d 213 (1993).
>
> 1981 AACS, R 28.5208(4) provides that "[a] user agency shall not sell or disseminate any information obtained through the LEIN to any individual group of individuals, organization, governmental agency, or corporation *which is not legally authorized to have access to this information.*" (Emphasis added.)
>
> We conclude this provision provides that, pursuant to a proper request, such as the one here, a court may order the LEIN information disseminated to one of the entities described. In other words, once the court has so ordered, then that entity is legally authorized to have access to the information.
>
> We recognize that 1981 AACS, R 28.5210(1) provides that "[a] user agency shall not disseminate criminal history record information received through the LEIN to a private person." Although it could be argued that subsection 1 applies to the situation at hand, a full reading of Rule 28.5210 leads us to reach a different result. We conclude that 1981 AACS, R 28.5210 deals primarily with a private person obtaining that person's own criminal record through the LEIN. This, as stated in subsection 1, is flatly prohibited. However, a private person is permitted to obtain that person's own criminal record from the Central Records Division of the Department of State Police. 1981 AACS,

R [28.]5210(2) and (3). To find that this provision prohibited the dissemination of LEIN information to anyone other than a user agency would render 1981 AACS, R 28.5208(4) mere surplusage. This we will not do. . . .

Accordingly, we conclude that the trial court erred in failing to allow defendant access to the LEIN information regarding the prosecution's witnesses. [*Mack, supra* at 362-363.]

We agree with the *Mack* majority's analysis and conclusion that LEIN information may be provided to a criminal defendant pursuant to a court order. *Id.* at 362.[6] The defendant in *Mack* had requested impeachment material that was admissible at trial. The LEIN data, e.g., criminal history record information, can be released to a criminal justice agency, which includes a court. Whereas LEIN information shall not be used for personal reasons or be released to any entity that is not legally authorized to have access, it may be released for a valid criminal justice purpose pursuant to a court order. Thus, we conclude that the LEIN act does not prohibit the court from ordering that LEIN information be given to the prosecutor and ordering that the prosecutor provide to the defendant any exculpatory or impeachment information found therein.

The prosecutor, however, is not required to give defendant more information than the exculpatory or impeachment information. The court's order required that the prosecutor submit the list of names of all civilian witnesses to the Ann Arbor Police Department "for the purposes of obtaining a computerized criminal history for such witnesses . . . ." Although

---

[6] The Supreme Court did not give its reasons for nullifying the decision in *Mack*. Even though *Mack* has been nullified, this Court is not precluded from deciding the issue in the same manner that *Mack* did.

the order did not require the prosecutor to turn over the entire computerized criminal history to defendant or provide defendant all the information that was in the LEIN, the order should have stated more precisely what was required to be produced to defendant. Once the prosecutor obtained the information from the Ann Arbor Police Department, the prosecutor could merely inform defendant of any exculpatory or impeachment evidence admissible under MRE 609, or could excise information that was not discoverable. MCR 6.201(D).

C

The city argues that the trial court erred in determining that witnesses would be precluded from testifying if the prosecutor and the city did not comply with the court's discovery order. We disagree. A trial court is authorized to impose sanctions when a party fails to obey an order to provide or permit discovery. The court may impose sanctions that it deems just, MCR 2.313(B), and may exclude testimony or evidence. MCR 6.201(J). We find no abuse of discretion in the trial court's decision to exclude the testimony of those witnesses for whom the prosecution did not turn over any exculpatory or admissible impeachment evidence to the defendant. *Barlow v John Crane-Houdaille, Inc*, 191 Mich App 244, 251; 477 NW2d 133 (1991).

II. DOCKET NO. 228734

A

Defendant argues that the trial court erred in granting the prosecutor's request to introduce evidence of

prior bad acts under MRE 404(b). The decision to admit evidence is within the trial court's discretion. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

MRE 404(b)(1) is a rule of inclusion that contains a nonexclusive list of "noncharacter" purposes for which evidence may be admitted. *People v Starr*, 457 Mich 490, 496; 577 NW2d 673 (1998). Evidence of other crimes, wrongs, or acts is admissible under MRE 404(b) if the evidence is (1) offered for a proper purpose other than to prove the defendant's character or propensity to commit the crime, (2) relevant to an issue of fact or consequence at trial, and (3) sufficiently probative to prevail under the balancing test of MRE 403. The trial court, upon a request by the defendant, may provide a limiting instruction to the jury. *People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993).

Here, the prosecutor made an offer or proof seeking to admit the other acts evidence:

> On or about March 31, 1999, a University of Michigan student reported that he was confronted by Defendant and Ariel Cunningham and that Defendant had pointed a small silver handgun at him. The student told police that on the previous day he had engaged in a weaponless fight with Ariel Cunningham. The next day Cunningham returned with Defendant and Defendant pointed the gun at him.

The prosecutor offered the evidence to show that defendant possessed a gun similar to that used in the shooting to establish his identity, show his familiarity with the gun, and to negate "any claim of accident or other unintended or otherwise legally innocent firing."

Here, the challenged evidence was offered for a proper purpose. While "identity" was not an issue at

trial, the evidence was properly admitted to show that defendant possessed a gun similar to that used in the shooting, to negate a claim of accident, and to show state of mind. The other acts evidence was relevant to an issue of consequence at trial, i.e., defendant's defense of self-defense. The evidence was also more probative than prejudicial. According to the police report, a witness provided defendant's name and his description and also described the handgun. The witness said that "Cadier" was the person who had the handgun. The information in the police report was sufficient to support the prosecutor's representations that the witness would testify that it was defendant who had pulled out the gun. Thus, the trial court did not err in permitting the prosecutor to elicit other acts evidence from the witness.

When the witness did not identify defendant at trial, however, the court instructed the jury that it could not consider the witness' testimony for any purpose. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Defendant contends that the testimony unduly prejudiced his case because the jury could not ignore the implication and inference that defendant was the gunman who threatened the witness. Even if defendant's contention were true, the evidence did not unduly prejudice defendant and there is not a reasonable probability that it could have affected the outcome of the trial. First, the witness stated unequivocally that he would recognize the person who pulled out the gun and that defendant was not that person. Second, whether the jury believed that defendant had previously pulled out his gun to frighten someone, there was undisputed evidence that defendant was carrying a gun; that he deliberately put himself in

the middle of an ongoing fight; that he started pulling at the fighters and ordering them to "chill out"; that when they turned their attention to him, he pulled out a gun to frighten them off; and that when they kept coming at him, he pointed his gun directly at the victim and shot him. Thus, the witness' testimony did not unduly prejudice defendant or change the outcome of the trial.

B

Defendant argues that the evidence was insufficient to support his conviction because the prosecutor failed to negate defendant's theory of self-defense. This argument is premised on the assertion that the prosecutor's witnesses were not credible and their testimony was contradicted. However, questions regarding the credibility of witnesses are to be resolved by the trier of fact. *People v Daoust*, 228 Mich App 1, 17; 577 NW2d 179 (1998). This Court should not interfere with the jury's role in determining the weight of the evidence or the credibility of witnesses. *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992).

A claim of self-defense first requires proof that the defendant has acted in response to an assault. *Detroit v Smith*, 235 Mich App 235, 238; 597 NW2d 247 (1999). "[W]here a defendant charged with murder asserts that he killed in self-defense, his state of mind at the time of the act is material because it is an important element in determining his justification for his belief in an impending attack by the deceased." *People v Harris*, 458 Mich 310, 316; 583 NW2d 680 (1998).

The killing of another in self-defense is justifiable homicide if the defendant honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm. *People v Fortson*, 202 Mich App 13, 19-20; 507 NW2d 763 (1993). Once evidence of self-defense is introduced, the prosecutor bears the burden of disproving it beyond a reasonable doubt. *Id.* at 20.

Viewed in a light most favorable to the prosecution, the evidence was sufficient to negate defendant's claim of self-defense. Christian Wiater testified that he saw a person fire a gun into the air. He heard the victim say, "Is that a cap gun?" The person who fired the gun replied, "This ain't no f___ing cap gun." Christian testified that the victim did not advance on the shooter and that he saw the shooter lower his gun and fire at the victim. Ryan Holdan testified that he heard the victim say, "What is that, a cap gun?" Then he heard "a voice" say, "This ain't no f___ing cap gun." Then he heard a second shot and saw people scatter. Soper testified that he saw two people approaching a guy who was backing up until he was against the wall. They were about three or four feet away from the guy when the guy pointed his gun at one of the two people, the one who was wearing a long-sleeved shirt. The person at whom the gun was pointed didn't seem affected and started laughing. Soper testified, "He said something along the lines of you're a bitch to the guy who shot at him." Soper saw defendant point the gun at the victim's chest. The victim kept advancing on defendant, and defendant shot the victim in the chest. Soper stated that he does not know if the victim got his hands on the shooter. Anderson testified that he heard a gunshot and saw

sparks. He saw a guy "with his chest puffed out" walking toward the sparks. The guy said, "What the f___ are you gonna do with that?" and the second shot was fired. The victim was within a few steps of the shooter. Cunningham testified that the victim was within an arm's length of defendant when defendant fired the fatal shot. The victim never touched defendant. However, he "started to bring his hands up and the shot went off and [defendant] started running." When the shot was fired, the victim was about a foot or two from defendant.

If the jury found that Christian Wiater's testimony was credible, it could have concluded that defendant did not fear an impending attack when he fired the second shot directly at the victim. If the jury believed Christian Wiater's testimony that the victim was not advancing on defendant, it could have found that defendant did not have an honest and reasonable belief that his life was in imminent danger or that he was threatened with serious bodily harm. If the jury believed both Christian Wiater and Holdan, it could have found that defendant's statement, expressing that his weapon was not a cap gun, was made not in fear of his life but as an aggressive threat in a bout of rage or passion, provoked by the victim's laughing and taunting him about the gun and calling him a "bitch."

If the jury believed Soper, Anderson, and Cunningham, it could have concluded that the victim was never close enough for defendant to honestly and reasonably believe that his life was in imminent danger or that there was a threat of serious bodily harm.

Viewing the evidence in the light most favorable to the prosecution, there was sufficient testimony, if

believed by the jury, to negate defendant's claim of self-defense beyond a reasonable doubt. *Fortson, supra* at 20.

The elements of voluntary manslaughter are (1) the defendant must kill in the heat of passion, (2) the passion must be caused by an adequate provocation, and (3) there cannot be a lapse of time during which a reasonable person could control his passions. *People v Sullivan*, 231 Mich App 510, 518; 586 NW2d 578 (1998), aff'd 461 Mich 992 (2000).

It is the element of provocation that distinguishes the offense of manslaughter from murder. *Id.* In *Sullivan*, 231 Mich App 518, this Court stated:

> The provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason. *People v Townes*, 391 Mich 578, 590; 218 NW2d 136 (1974). Case law has consistently held that the provocation must be adequate, namely, that which would cause a *reasonable person* to lose control. *Id.*
>
> The determination of what is reasonable provocation is a question of fact for the fact finder. *Id.* at 589. However, the court furnishes the standard of what constitutes adequate provocation, i.e., that provocation that would cause a reasonable person to act out of passion rather than reason. Where, as a matter of law, no reasonable jury could find that the provocation was adequate, the court may exclude evidence of the provocation.

Because provocation is measured under a reasonable person standard, it is uniformly held that a defendant's special mental qualities or special traits are not to be considered in measuring the adequacy of provocation. *Sullivan, supra* at 519.

The evidence here was sufficient to support the jury's verdict of manslaughter. Defendant was in the

middle of an affray when several of the men turned on him and started to approach him. The events were swift and frightening. After defendant fired a warning shot, the victim continued to approach defendant. If the jury believed Soper's testimony, it would have found that the victim was taunting and provoking defendant, which was adequate provocation to cause a reasonable person to lose control and act out of passion, rather than reason. Accordingly, viewed in a light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt.

C

Defendant maintains that the trial court abused its discretion in denying his motion for a new trial because the evidence that supported self-defense greatly outweighed the evidence that negated it. Defendant bases this claim on the contention that the prosecution witnesses were not credible.

This Court reviews for an abuse of discretion a trial court's denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence. *People v McCray*, 245 Mich App 631, 637; 630 NW2d 633 (2001). "The test is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Id.* "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *People v Lemmon*, 456 Mich 625, 647; 576 NW2d 129 (1998).

In motions for a new trial based on the claim that the verdict is against the great weight of the evidence, the issue of credibility of the witnesses is implicit in the determination. *Id.* at 638. However, "[n]ew trial motions based solely on the weight of the evidence regarding witness credibility are not favored." *Id.* at 639. Contrary to defendant's assertion in his appellate brief that, "[w]hen considering whether the verdict is against the great weight of the evidence, the court may assess the credibility of the witnesses", the Court in *Lemmon* stated:

> We align ourselves with those appellate courts holding that, absent exceptional circumstances, issues of witness credibility are for the jury, and the trial court may not substitute its view . . . . We reiterate the observation in *Anderson v Conterio*, 303 Mich 75, 79; 5 NW2d 572 (1942), that, when testimony is in direct conflict and testimony supporting the verdict has been impeached, if "it cannot be said as a matter of law that the testimony thus impeached was deprived of all probative value or that the jury could not believe it," the credibility of witnesses is for the jury. [*Lemmon, supra* at 642-643.][7]

The *Lemmon* Court addressed the several tests that have been developed that would allow a court to "take the testimony away from the jury." Among them, as urged by defendant in this case, is "where the witness' testimony has been seriously 'impeached' and the case marked by 'uncertainties and discrepancies.' " *Id.* at 643-644, quoting *United States v Martinez*, 763 F2d 1297, 1313 (CA 11, 1985).

Defendant claims that this is the situation here. He contends that the prosecutor's attempt to negate

---

[7] Defendant's reliance on *People v Herbert*, 444 Mich 466; 511 NW2d 654 (1993), is misplaced. *Herbert* was overruled in *Lemmon, supra* at 627.

defendant's claim of self-defense rested on Christian Wiater's testimony that, before defendant shot his gun, defendant stated "[t]his ain't no f____ing cap gun." According to defendant, Wiater's testimony was so seriously impeached, and the case marked by so many uncertainties and discrepancies, that this Court should "take the testimony away from the jury." We disagree. The above exception to the general rule, cited in *United States v Martinez, supra,* and relied on by *Lemmon,* contemplates a situation where the "witness" in question is the prosecutor's sole or principal witness *and* the witness' testimony is "seriously impeached" *and,* in addition, there are "uncertainties and discrepancies" throughout the case. In *Martinez, supra* at 1314, the court declined to find an exception to the rule that the court may not "overturn the credibility choice made by the jury" or "interfere with the jury's factual findings" unless it could be found that "the government's case was presented by impeached witnesses, while the testimony of the defendants' witnesses was unwaivering and corroborated by independent evidence." This is not the situation in this case. Here, the government's case did not consist entirely of testimony of impeached witnesses, and defendant did not present any other witness on his behalf but himself. Also, there was no independent evidence to corroborate defendant's testimony.

Not only were there numerous eyewitnesses and participants who testified about the incident, including defendant, but also defendant has failed to demonstrate any "uncertainties and discrepancies" in the case. Conflicting testimony is not sufficient. *Lemmon, supra* at 647. Thus, the fact that Christian Wiater's testimony was impeached does not require this Court to step in and take over the jury's function.

As we explained in part II(C) of this opinion, the jury could have found that Wiater's testimony, that the victim was not advancing on defendant when defendant fired the fatal shot and that defendant threatened the victim with his statement that "[t]his ain't no f___ing cap gun," was credible. Further, as pointed out in part II(C), there was testimony, in addition to Wiater's testimony that tended to negate self-defense, that the jury could also have found credible.

The evidence showed that defendant was being confronted, taunted, and provoked by the victim and one or two others, even after he fired a warning shot into the air. There were several other unknown men surrounding defendant, creating a volatile and dangerous situation. The great weight of the evidence did not lead to the conclusion that defendant acted in self-defense. Instead, if the jury found the prosecution's witnesses to be credible, the great weight of the evidence supports the jury's verdict. Thus, we conclude that the trial court did not abuse its discretion in denying defendant's motion for a new trial on the ground that the verdict was against the great weight of the evidence.

D

Last, defendant argues that he was denied a fair trial by improper prosecutorial remarks. Because defendant did not object to the allegedly improper remarks, review is foreclosed unless no curative instruction could have removed any undue prejudice to the defendant or manifest injustice would result from failure to review the alleged misconduct. *People v McAllister*, 241 Mich App 466, 473; 616 NW2d 203 (2000). In order to avoid forfeiture under the plain

error rule, defendant must show plain error that affected his substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999); *People v Schutte*, 240 Mich App 713, 720; 613 NW2d 370 (2000).

First, there is no merit to defendant's suggestion that the prosecutor improperly shifted the burden of proof concerning self-defense by instructing the jury to consider whether the defendant "knew about any other ways of protecting himself." See CJI2d 7.15(5). Second, although the prosecutor's statement that defendant never testified that Nicholas Seitz tried to grab his arm was a misrepresentation of the evidence, the statement did not affect the jury's verdict and, therefore, was harmless.[8] Third, there is no basis for a determination that defendant was denied a fair trial because of the cumulative effect of multiple errors.

Affirmed.

HOOD, J., concurred.

SAWYER, J. (*concurring in part and dissenting in part*). While I agree with the majority's affirmance of defendant's convictions, and with the conclusion in part I(A) of the majority opinion that the city has standing to challenge the trial court's discovery order, I respectfully dissent from the majority's conclusion that the trial court correctly concluded that defendant was entitled to the Law Enforcement Information Network (LEIN) information on the prosecutor's civilian witnesses.

---

[8] The court instructed the jury that the lawyers' statements and their arguments are not evidence and that it should accept only statements by the lawyers that are supported by the evidence. Juries are assumed to adhere to the instructions they are given. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

It is fairly clear to me that the trial court erred in ordering LEIN information to be gathered for defendant. By statute, LEIN information may not be given to a private person for any purpose and doing so is a criminal offense under MCL 28.214, which provides in relevant part:

> (2) A person shall not disclose information from the law enforcement information network to a private entity for any purpose, including, but not limited to, the enforcement of child support programs.
>
> (3) A person shall not disclose information from the law enforcement information network in a manner that is not authorized by law or rule.
>
> (4) A person who violates subsection (2) or (3) is:
>
> (a) For a first offense, guilty of a misdemeanor punishable by imprisonment for not more than 90 days or a fine of not more than $500.00, or both.
>
> (b) For a second or subsequent offense, guilty of a felony punishable by imprisonment for not more than 4 years or a fine of not more than $2,000.00, or both.

No law or rule has been identified that authorizes the disclosure of the LEIN information as ordered by the trial court. Thus, the trial court commanded the city and its employees to commit criminal offenses.

The majority puts great stock in this Court's opinion in *People v Mack*, 218 Mich App 359; 554 NW2d 324 (1996), nullified 455 Mich 865 (1997). Although the majority acknowledges that the Supreme Court ordered that *Mack* was to have no precedential effect, it apparently finds the analysis to be persuasive. The majority correctly states that, because the Supreme Court merely withdrew the precedential affect of *Mack*, rather than reversing *Mack*, this Court is not precluded from reaching the same conclusion as did

the panel in *Mack*. However, it would certainly seem reasonable to conclude that the Supreme Court found the reasoning in *Mack* to be suspect.

Indeed, in looking at the rationale of *Mack*, 218 Mich 363, relied on by the majority, I see that the reasoning is, in fact, suspect. *Mack* reasons that 1981 AACS, R 28.5208(4) prohibits dissemination of LEIN information to a person or entity " 'which is not legally authorized to have access to this information.' " The *Mack* panel then rationalizes that, because dissemination was ordered by the court, that person or entity is now authorized by law to have access to the information. This conclusion is reached without any reference to the authority by which the court orders the information to be released and without regard to MCL 28.214, which specifically prohibits dissemination to a private entity. The reasoning in *Mack* is circular: the trial court has the authority to order release of the information because it entered an order to release the information.

The majority also puts stock in the fact that the prosecutor would be obligated to turn over only exculpatory information to defendant. This, however, does not address the central issue whether there is any authority to require either the prosecutor or the city to seek out such information. As this Court stated in *People v Leo*, 188 Mich App 417, 427; 470 NW2d 423 (1991), the prosecutor "is not required to undertake discovery on behalf of a defendant." See also *People v McWhorter*, 150 Mich App 826, 832; 389 NW2d 499 (1986). Thus, while I might agree that the prosecutor has an obligation to turn over information regarding a witness' criminal background that would be beneficial to the defendant *and* that the pros-

ecutor otherwise has in his file, I am aware of no authority that supports the proposition that the prosecutor is obligated to seek out such information.

Finally, with respect to the majority's conclusion that the trial court properly concluded that witnesses would be precluded from testifying if the prosecutor and the city did not comply with the court's discovery order, I do not believe that the city is a proper party to raise this issue. While the city has standing to challenge the discovery order as it pertains to the city, the prosecutor is the proper party to challenge sanctions that the trial court imposes with regard to the trial itself. The city may only challenge sanctions imposed against it, if any.

In sum, the prosecutor is under no obligation to engage in discovery for a defendant. More to the point, the prosecutor, and the city for that matter, is specifically prohibited by statute from engaging in the type of discovery ordered by the trial court. Accordingly, I would conclude that the trial court erred in ordering the city and its employees to engage in criminal behavior. I would reverse.